#26544-rev & rem-LSW

**2014 S.D. 27**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA
* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellant,

    v.

MARICELA NICOLASA DIAZ,                   Defendant and Appellee.

* * * *
APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
HANSON COUNTY, SOUTH DAKOTA
* * * *

THE HONORABLE TIMOTHY W. BJORKMAN
Judge
* * * *

MARTY J. JACKLEY
Attorney General

SHERRI SUNDEM WALD
Deputy Attorney General

DOUGLAS P. BARNETT
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellant.


CHRIS A. NIPE of
Larson & Nipe
Mitchell, South Dakota
    and
DOUGLAS M. DAILEY of
Morgan, Theeler, Wheeler,
  Cogley & Peterson, LLP
Mitchell, South Dakota                    Attorneys for defendant
                                          and appellee.

* * * *

ARGUED SEPTEMBER 30, 2013
OPINION FILED **05/07/14**

#26544

WILBUR, Justice

[¶1.]     The trial court suppressed Maricela Diaz's confession.  The State filed an intermediate appeal of the suppression order, arguing that she knowingly and intelligently waived her *Miranda* rights prior to her confession.  We reverse.

## Facts and Procedural History

[¶2.]     On November 10, 2009, Jasmine Guevara's (Jasmine) badly burned body was found in the trunk of her car in Hanson County, South Dakota.  Although she had multiple stab wounds, an autopsy revealed that she had been burned alive.

[¶3.]     The next day, around 7:00 a.m., Mitchell Police Department investigators Joel Reinesch (Reinesch) and Toby Russell (Russell) traveled to the Mitchell residence of Jasmine's friend, Steffany Molina (Molina).  The investigators interviewed Molina about Jasmine.  Following the interview, Reinesch asked if there was anyone else in the house.  Molina answered affirmatively and brought out two Hispanic individuals who identified themselves as Alex Diaz (Salgado)[1] and Maricela Diaz (Diaz).  The pair spoke to each other intermittently in Spanish while in Reinesch's presence.

[¶4.]     After he had left Molina's residence, Reinesch realized he had forgotten to obtain date of birth information for Salgado and Diaz.  Reinesch then contacted Molina on her cell phone and asked for the additional information.  Molina handed Salgado the phone.  Salgado again identified himself as Alex Diaz and gave a birth date indicating he was 16 years old.  Salgado provided Diaz's name and her date of

---

1.     The next day police learned Alex Diaz was actually Alexander Salgado.

-1-

birth. Both birth dates Salgado provided were false.[2] As a result, Reinesch found no record of individuals matching the information provided.

[¶5.] Later that same morning, Reinesch returned to the Molina residence to conduct follow-up investigation, this time accompanied by Special Agent Jay Goldhorn. When they entered the living room, Salgado and Diaz were sitting on the couch. During this time, the pair again spoke to each other in Spanish. In neither instance when Reinesch was at the Molina residence were questions asked of Diaz nor did she make any statements to the officers. Salgado, however, did speak with Reinesch. Salgado said he and Diaz had come to Mitchell from Mexico and that they had last seen Jasmine the previous day around 4:00 p.m.

[¶6.] As the investigation continued, the police learned what Jasmine was wearing and that she had been seen at Walmart on the night of her murder. The authorities secured and viewed Walmart's surveillance video for the time in question. The video revealed Jasmine accompanied by two individuals whom the police recognized as Salgado and Diaz. The video appeared to place Salgado and Diaz with Jasmine around 8:00 p.m. on the night of her murder, contrary to Salgado's account to Reinesch. Based on the information the officers had, no one saw Jasmine after that point.

[¶7.] On November 12, 2009, the authorities sought to locate and further question Salgado and Diaz. At 12:30 p.m. that same day, Reinesch and Investigator Dean Knippling located Diaz alone at the Molina residence. Reinesch re-introduced

---

2.      Police would later learn that Salgado was 20 years old and Diaz was 15 years old.

himself to Diaz, explained that he would like to speak with her further regarding an investigation, and asked if she would be willing to come to the police department. She agreed and the officers transported her to the Mitchell Police Department for further questioning. Diaz arrived at the jail at approximately 1:00 p.m. Once there, she was placed in Interview Room #1, either an 8x10 or 10x12 foot room equipped with a small table and chairs.

[¶8.] Russell and Officer Hector Soto (Soto) of the Sioux Falls Police Department entered Room #1 just after 1:18 p.m. Soto is fluent in Spanish, his first language, and his assistance was sought with the Spanish translation of the interviewees. After introducing themselves, Russell informed Diaz that the officers were involved in an investigation looking for Jasmine. Russell then requested some preliminary information.

[¶9.] In response, Diaz provided several pieces of false information: she spelled her first name incorrectly, provided no middle name although she had one, supplied a false birth date, and gave a false name for her mother. She told officers that she did not know the name of the town in which her parents lived or their places of employment, and provided a false number for them. She also failed to correct Russell's assumption that her parents lived together. Diaz gave the officers a false name for Salgado, told them he was her brother, and said that Molina's mother had brought them to South Dakota for vacation. With this information, almost all of which soon proved false, Russell and Soto left the room at 1:24 p.m. Russell then unsuccessfully attempted to contact Diaz's parents.

[¶10.]     Shortly thereafter, the officers returned to the interview room. This time Diaz provided a second parental contact number. Responding to a follow-up question as to where her parents lived, Diaz told the officers they lived in Fort Wayne, Indiana, but reiterated that she did not know the name of the place where they worked. In response to Soto's question of whom Diaz would call in an emergency, she replied, "Oh, to reach my mom? . . . Mm, just those numbers because I don't got no more."[3] The officers again left the room to attempt to contact Diaz's parents.

[¶11.]     At approximately 1:40 p.m., Russell and Soto returned to the interview room. Russell then continued his effort to obtain identifying information. In this brief session, Diaz told them she had lived with her family in Indiana for four or five years, and prior to coming to Indiana had lived in Mexico. She told the investigators she had attended South Side High School in Fort Wayne until the time in October when they came to South Dakota. She told them her brother—actually Salgado—was either 18 or 19, but was not sure and that he was no longer in school. Diaz also said she "kind of" had a boyfriend who went to school in Mitchell, but did not know his last name.

[¶12.]     After exiting the interview room at 1:45 p.m., Russell contacted the Fort Wayne Police Department seeking assistance in locating Diaz's parents. In response, a Fort Wayne detective spoke with Reinesch and provided correct names

---

3.     Diaz was also not forthright in discussing why she and Salgado were not in school. She stated the school told them to come back on December 5. She then modified her response to indicate her mother told them to come back at that time. Police would later learn that Diaz dropped out of ninth grade prior to coming to South Dakota.

and dates of birth for Diaz and Salgado and emailed photos of each. Fort Wayne authorities also identified Diaz's mother as Irma Gutierrez-Placencia (Mother). As a result of obtaining Diaz's correct birth date, the officers learned Diaz was listed as a runaway child or missing person.

[¶13.] Russell finally reached Mother by telephone at approximately 3:30 p.m. at the second number Diaz had provided him. Having realized Mother spoke Spanish, Russell handed the phone to Soto.[4] The entire dialogue between Mother and Soto was in Spanish. Mother informed Soto that she was Diaz's mother, Diaz had a baby girl with Salgado, Diaz was 15 years old, and Diaz had called Mother that morning and told Mother that Salgado had beaten her and forced her to go to South Dakota. Soto then informed Mother that Diaz was detained over another investigation and was in good health. Soto then proceeded with his inquiry:[5]

> **Soto:** We have already fed her, she, she is in good health. And the reason why we are calling you is to ask for your permission to talk with her about the investigation that we are conducting.
>
> **Mother:** What permission, are you doing a separate investigation there in South Dakota?
>
> **Soto:** Yes. Because she is a minor, we need permission from her parents to talk to her about the matter here. Because it is possible that she is a witness to what happened.
>
> . . . .
>
> **Mother:** . . . Well, allow me a second, because I am talking with, with another person. Allow me a second.
>
> **Soto:** Yes.

---

4. At this point during the investigation Soto knew it was a homicide investigation, but did not know Diaz was a suspect.

5. The following excerpt is a translation of the Spanish conversation held between Soto and Mother. Soto translated the conversation.

**Mother:** (Mother talking to another person in the background) . . . investigation, they are investigating over there and I think another matter, (inaudible) I don't know, but they want permission, for me to talk, for me to give permission for her to talk, since she is a minor they need me to say . . . (back speaking with Soto) Well, it's alright, well, you can interrogate her.

**Soto:** Yes, we can interrogate her. Look, if you want to talk with her, you can talk to her after, or now, or whatever you like, if you have any questions for her. Like I said, she is fine, she is not hurt in any way. But I would like to get your information. We only have the telephone number that we called you on. Your name is Irma right? Ma'am?

**Mother:** Yes.

**Soto:** And are you Maricela's natural mother?

**Mother:** Yes.

. . . .

**Mother:** I have a question.

**Soto:** Yes, of course.

**Mother:** Excuse me. You caught her in another investigation. You caught her at the house right? Where was she living[?]

**Soto:** Let me ask the detective that detained her. (To Russell in English) Say, she wants to know where she was picked up.

(Back speaking with Mother in Spanish) [T]hey picked her up at the house of a girl named [Steffany] Molina.

**Mother:** Mhmm.

**Soto:** Do you know who she is?

**Mother:** Uh, no honestly, well not her, I don't know that girl that you said but . . .

**Soto:** Do you know anyone here in South Dakota?

**Mother:** No, no one.

**Soto:** OK then, because she told us that you have friends here and that they are here visiting.

(To Russell in English) Mom doesn't know anybody in South Dakota. She doesn't know who this person is. So that's what that was about, but we got permission to interrogate from her mother.

(Back speaking with Mother in Spanish) Any other questions, Ma'am?

**Mother:** She is detained right now, well, you are not going to let her go right?

**Soto:** No, of course not, we can't let her go, knowing that you reported her. We cannot do that.

**Mother:** And you can't send her over here to Fort Wayne, Indiana? What's going on is that I, well I honestly don't have a lot of money. We don't have a car to go over there.

**Soto:** Well, when the time comes for her to return there, arrangements will be made. Yes, and the detectives will call you as well when that time comes. But we are not going to release her. We will not let her go to anyone other than the parents.

**Mother:** Was Maricela there alone[?]

**Soto:** No, we also have Alejandro here[.]

**Mother:** You also have Alexander?

**Soto:** Yes. Yes.

. . . .

**Soto:** . . . But I appreciate your permission to talk with the girl and if you would like, you can talk with her later.

**Mother:** Yes if you could dial over here, please my daughter.

**Soto:** Yes of course. To this telephone right?

**Mother:** Yes, please.

During the conversation, Mother never requested to speak with Diaz.

[¶14.] From 1:45 p.m. to 4:00 p.m. the officers attempted to contact Diaz's parents and spoke with Mother. During this time, Diaz remained in the interview room, received lunch, and used the restroom a couple of times. When an officer brought Diaz her lunch, Diaz inquired about Jasmine and stated she was confused that the officers were not asking her about Jasmine. The officer explained that they needed to contact her parents before they could talk to her about Jasmine. Also during this time the officers placed Salgado in the interview room next to Diaz. The

pair engaged in a discourse in which Diaz encouraged Salgado to lie to police, claim that his father was Fernando Diaz, and say that the two were in South Dakota on vacation.

[¶15.]     After Soto had spoken with Mother, he and Reinesch entered the interview room at 4:00 p.m. At that point, officers had learned the couple's correct names and dates of birth and that Salgado was not her brother but her boyfriend, they were involved romantically, they had a child together back in Indiana, Diaz was a reported runaway, and she had called her mother that morning to claim that Salgado had abused her. They learned that almost everything Diaz had told them earlier was false. They also believed that Diaz and Salgado were with Jasmine on the night of her death and were the last people known to have seen her alive.

[¶16.]     The questioning began around 4:00 p.m.:

> **Reinesch:** Okay. Maricela, I'm Joel Reinesch. I'm an investigator here with the Police Department. You can call me Joel, call me whatever you wanna call me, okay? Uh, this is Hector. I believe you spoke with Hector today as well –
>
> **Diaz:** Mm-hm.
>
> **Reinesch:** -- too so you've spoken with both of us. Um, Maricela, there's – there – there's a couple of things that we'd like to talk about, um, you know, definitely first and foremost, I mean the – the stuff I'm really concerned about your safety and you know we – we spoke with your mom today and stuff like that and I'd really like to sit down and talk with ya about that stuff. Since I brought ya down here and everything else, there's – there's a protocol that I've gotta go through first, okay? Not a big deal at all and we'll get through this and we'll getcha takin' care of. Maricela, like I said, I'm Joel Reinesch, I'm a Police Officer here at the Police Department. You have a continuing right to remain silent. Anything you say can be used as evidence against you. You have the continuing right to consult with and have the presence of an attorney. If you cannot afford an attorney, an attorney will be appointed for you. Do you understand these rights, Maricela?

**Diaz:** No.

**Reinesch:** What's that?

**Diaz:** Uh, you talk so fast.

**Reinesch:** I talk so fast? Okay, I'll – I'll read 'em again and then if you have any questions, then we'll – we'll go from there, okay? Like I said, I'm Officer Reinesch, okay? You have the continuing right to remain silent. Anything you say can be used as evidence against you. You have the continuing right to consult with and have the presence of an attorney. If you cannot afford an attorney, an attorney will be appointed for you. Do you understand those rights?

**Diaz:** I think so.

**Reinesch:** Okay and – and – and basically – basically what it is, Maricela, is, is you have the right to – to not tell me whatever you don't wanna tell me. If you don't wanna tell me somethin', you don't have to, okay? That's basically you know, what it is[.] You know, I'd like to sit down and have a conversation with ya, you know, especially about the stuff that's been goin' on from, you know, from Indiana and stuff like that, you know as far as, you know, you callin' mom today and stuff like that. That's what I'd like to talk to you about, okay? But you have the right to not talk to me, okay? That's basically what I'm reading to ya. Do – do you understand that?

**Diaz:** So I don't need – I stay silent also?

**Reinesch:** You – you can if you want to. Do you – do you – do you wanna have a conversation with me? That's basically what I'm talkin' about, Maricela.

**Diaz:** But about me or about –

**Reinesch:** About –

**Diaz:** -- Jasmine?

**Reinesch:** -- everything, everything. I'd like to talk about you and then, you know, whatever it goes from there, that – that's where it goes. But first and foremost, I'd like to sit down and talk with ya about the stuff that – that's been goin' on and you know, and bein' missin' and everything else like that, 'cause I mean I – I know that you've been in fear, you know as far as that goes, you know? I mean that's obvious from talkin' to mom and everything else. And that's – you know, that's what I wanna start out talkin' to ya about. Okay? Do you – do you wanna talk to me about that?

**Diaz:** About my mom?

**Reinesch:** About you and being gone from Indiana and stuff like that.

**Diaz:** So – I don't know.

**Reinesch:** Hector, can you take a minute?

**Soto:** Well, It's Maricela. Maricela Nicolasa Diaz. Right? See here – here's the deal. We're gonna be honest with you. Okay we – we know who you are. We spoke – I spoke with your mom, Irma[,] a little while ago and she said it was okay to talk to you. She also told me that you called her for help. She told me that this morning. And we're concerned for you, okay?

**Diaz:** Mm-hm.

**Soto:** We're concerned that, you know, I mean what you told her really made her nervous. Okay? So we wanna talk to you about – about all those issues and about all those things. But before we do that, we gotta make sure like – like Joel explained here that – that you understand your rights and you said that you kinda did that – and he read 'em again to ya. Okay? Is there any part of that that you don't understand, the rights that he – that he read to ya?

**Diaz:** I don't understand anything.

**Soto:** You don't understand anything that he said? Why is that?

**Diaz:** Because I know a – a little – I know how to speak, but some things I don't know how to speak English and something – um, understand it really well. But I –

**Soto:** Would it help if – if I read you those same rights in Spanish?

**Diaz:** (Nods head affirmatively)

**Soto:** Would that help a lot?

**Diaz:** Mm-hm.

**Soto:** Okay, 'cause – is it – is Spanish your first language then? You speak Spanish better than English?

**Diaz:** Mm-hm.

[At this point, Soto's discussion with Diaz turned to Spanish.]

**Soto:** Okay, I'll just read 'em right, right, just the way that they're written here in English, here. I'm just gonna translate, okay? You have the right to – to remain silent, you understand?

**Diaz:** Mm-hm.

**Soto:** Anything you say can be used as evidence against you, you understand?

**Diaz:** Mm-hm.

**Soto:** You have the right to consult with and have present an attorney, you understand?

**Diaz:** Mm-hm.

**Soto:** If you cannot afford an attorney, an attorney will be appointed for you. Do you understand your rights?

**Diaz:** Mm-hm.

**Soto:** Yes or no?

**Diaz:** Yes.

**Soto:** Yes. And do you want to talk to us about the events that we – yes or no?

**Diaz:** You speak Spanish?

**Soto:** Yes, I speak Spanish. Of course.

**Diaz:** Why didn't you tell me this from the beginning?

**Soto:** You were talking just fine with him.

**Diaz:** So – um –

**Soto:** Do you want to talk to us about the events? Yes or no? Because your – I already spoke to your mom and she said that we can talk to you about what happened and all the events with the family, with Alexander. Do you want to talk with us?

**Diaz:** But, about me?

**Soto:** About you, about Jasmine, about Alexander, everything.

**Diaz:** About Jasmine, all that I know is that the other day –

**Soto:** First of all, do you want to talk, yes or no?

**Diaz:** Yes.

**Soto:** Yes. (In English) Okay she says yes to –

**Reinesch:** (In English) Yes? Okay. Um, then explain the adult part[.]

> **Soto:** (In Spanish) And also, another thing that I have to tell you is . . . um . . . if these events end up in court, it's possible that they could charge you as an adult, as an adult person of –
>
> **Diaz:** But, what charges?
>
> **Soto:** Any charge that results from here. Do you understand?
>
> **Diaz:** Uh-huh.
>
> **Soto:** (In English) Okay. Okay, now, do you want to continue speaking in – in English for Joel's benefit? Or do you wanna speak in Spanish?
>
> **Diaz:** (In Spanish) In Spanish so that I don't get confused and say too much or too little.

The questioning continued until Diaz confessed around 5:30 p.m.[6] Over the next four hours, Diaz explained the events of Jasmine's murder. At 10:00 p.m., after Diaz's evidence inventory was taken, she was transported to the jail.

[¶17.] The officers testified that they did not initially offer Diaz an interpreter because based on her ability to respond it did not then appear that she

---

6. The confession, the half-hour preceding it, and the hour following it were absent from the video and audio recording. The Mitchell Police Department had begun using a new video/audio system in its interrogation rooms and officers were unaware the devices were programmed to shut off and download after four hours of continuous use. Thus, there was no recording from 5:00 p.m. to 6:30 p.m. One hour of actual interview was missing as the balance of the time was consumed by breaks. No evidence was presented that the missing video was intentionally caused by the officers.

   Amici curiae urge this Court to adopt a rule requiring all juvenile interrogations to be electronically recorded. Although we recommend electronically recording juvenile interrogations because it helps judges resolve admissibility issues, protects police from frivolous claims of misconduct, and protects juveniles' rights, *In re Jerrell C.J.*, 699 N.W.2d 110, 122-23 (Wis. 2005), we reserve the analysis of such a requirement for a case where the issue squarely presents itself. Here, the video and audio recording captured all but one hour of questioning. Although the confession and the half hour preceding it are missing, the crucial *Miranda* warnings and responses to those warnings are captured.

needed one. During the entirety of the questioning, the tone of the interview was conversational. Officers did not raise their voices or swear at or threaten Diaz in any way. According to Soto, Diaz appeared nervous only when Soto challenged her about the inconsistencies in her story. Diaz never requested to speak with her mother or an attorney, nor did she ask officers to stop questioning. Diaz was not under the influence of drugs or alcohol and appeared to be in normal health.

[¶18.] Later that evening, following the questioning and confession, the state's attorney obtained a temporary custody directive from Judge O'Brien. A hearing to decide whether to continue custody was held the following day on November 13, 2009. Diaz was present and her mother appeared telephonically.

[¶19.] While in juvenile court before Judge O'Brien, Diaz moved to suppress her confession arguing she did not voluntarily, knowingly, and intelligently waive her *Miranda* rights. The motion was denied. The case was then transferred to adult court in the First Judicial Circuit before Judge Bjorkman. The trial court then reopened the motion to suppress. The trial court granted the motion to suppress and in doing so found that Diaz made her statements voluntarily, but did not knowingly and intelligently waive her rights. The State takes this intermediate appeal arguing the trial court erred in granting Diaz's motion to suppress.[7]

---

7. We only address whether Diaz knowingly and intelligently waived her *Miranda* rights. On appeal, Diaz challenges the trial court's decision that the confession was voluntary. However, Diaz failed to file a notice of review challenging the trial court's finding on voluntariness. "This Court has consistently held that failure to comply with the notice of review requirements results in a waiver." *State v. Blackburn*, 2009 S.D. 37, ¶ 8, 766 N.W.2d 177, 181 (citations omitted). Therefore, we do not reach the issue of voluntariness.

## Standard of Review

[¶20.]     "A ruling on a motion to suppress based on an alleged violation of a constitutionally protected right is a question of law reviewed de novo." *State v. Horse*, 2002 S.D. 47, ¶ 11, 644 N.W.2d 211, 217-18 (citation omitted). "[W]e consider the totality of the circumstances surrounding the interrogation as factual determinations, giving deference to the trial court's findings of fact." *State v. Ralios*, 2010 S.D. 43, ¶ 24, 783 N.W.2d 647, 655 (citations omitted). "Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo." *State v. Hess*, 2004 S.D. 60, ¶ 9, 680 N.W.2d 314, 319 (citation omitted). As a result, we review the entire record and make an independent determination of whether Diaz knowingly and intelligently waived her *Miranda* rights. *People in the Interest of J.M.J.*, 2007 S.D. 1, ¶ 5, 726 N.W.2d 621, 624 (citation omitted).

## Decision

[¶21.]     When a defendant moves to suppress statements taken during a custodial interrogation, the prosecution must show by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived her *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 475, 86 S. Ct. 1602, 1628, 16 L. Ed. 694 (1966); *State v. Tuttle*, 2002 S.D. 94, ¶¶ 7-8, 650 N.W.2d 20, 25-26.[8] To be knowing and intelligent, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of

---

8.     For *Miranda* to apply, the juvenile must be subject to custodial interrogation. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. The State concedes that Diaz was in custody while at the police station.

the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986). However, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574, 107 S. Ct. 851, 857, 93 L. Ed. 2d 954 (1987).

[¶22.] Because "children can be easy victims of the law" and "may lack the sophistication, knowledge, or maturity to understand the ramifications of an admission[,]" we will "take special care to scrutinize the record when juveniles are involved." *J.M.J.*, 2007 S.D. 1, ¶ 14, 726 N.W.2d at 627-28 (citations omitted). In fact, we afford a juvenile "additional, not less, protection of [her] constitutional rights." *Id.* ¶ 15, 726 N.W.2d at 628 (citation omitted).

[¶23.] A totality of the circumstances analysis applies in deciding whether a juvenile knowingly and intelligently waived her *Miranda* rights. *Fare v. Michael C.*, 442 U.S. 707, 724-25, 99 S. Ct. 2560, 2571-72, 61 L. Ed. 2d 197 (1979); *Horse*, 2002 S.D. 47, ¶ 13, 644 N.W.2d at 218. "We consider the juvenile's age, experience, education, background, intelligence," level of maturity, "capacity to understand the warnings, the nature of [the] Fifth Amendment rights, and the consequences of waiving such rights . . . together with the gravity of [any] misrepresentations used by the interrogating officers." *Horse*, 2002 S.D. 47, ¶ 13, 644 N.W.2d at 218-19 (citations omitted). Although not per se rules, other significant factors taken into consideration are whether the juvenile was warned "of the possibility of being tried as an adult," whether notice was given to the juvenile's parent or guardian, and

whether the juvenile had an opportunity to confer with the parent or guardian.[9]

*J.M.J.*, 2007 S.D. 1, ¶¶ 15-16, 726 N.W.2d at 628 (citation omitted).

*Age, experience, education, background, intelligence, and maturity*

[¶24.]    At the time of questioning, Diaz was 15 years and two months old. She moved to Indiana from Mexico when she was 11 years old and had reached the ninth grade at South Side High School in Fort Wayne, Indiana. While in school in Mexico she had received reasonably good academic marks. While in Fort Wayne, she struggled in classes that required proficiency in English, but performed reasonably well in English as a second language class. Ms. Bookmeyer, Diaz's teacher for grades six through eight, characterized a sixth grade Diaz as a good student, hard-working, talkative, and very respectful. During her seventh grade year Diaz began her relationship with Salgado, she began to skip school in her eighth grade year, and eventually dropped out of school in the fall of her ninth grade year.

---

9.    Amici curiae urge this Court to adopt a per se rule that a juvenile must be afforded meaningful consultation with an interested adult, preferably an attorney, before interrogation. We decline to adopt such a rule. South Dakota case law is clear that affording that opportunity to a juvenile is a factor in the totality of circumstances, not a per se rule. *Horse*, 2002 S.D. 47, ¶ 26, 644 N.W.2d at 224; *J.M.J.*, 2007 S.D. 1, ¶ 15, 726 N.W.2d at 628. If the Legislature intended to create such a rule, it could have done so after our decision in *Horse*. However, no such change has been made to SDCL 26-7A-15. *See* Iowa Code Ann. § 232.11 (West 2014) (providing that a child taken into custody for any alleged delinquent act cannot waive his right to counsel if the child is under sixteen years of age unless written consent of the child's parent is given and that the waiver of a child over sixteen years of age is only valid if the child's parents are notified that the child has been taken into custody, of the alleged delinquent act of the child, of the location of the child, and of the right of the parent to visit and confer with the child).

[¶25.] As a result of her relationship with Salgado, Diaz was a victim of physical and sexual abuse. When she was still 13 years old, Diaz began a sexual relationship with Salgado. At 14, Diaz became pregnant with Salgado's child, which she carried to term. At 15, Diaz ran away from home with Salgado, leaving her infant daughter behind in her mother's care.

[¶26.] Diaz's psychologist conducted psychological evaluations of Diaz. The pertinent findings of those tests included that Diaz possessed tendencies toward oppositional, resistant, sneaky, and underhanded behavior. Both the State's and Diaz's evaluating psychiatrists diagnosed Diaz with adolescent onset conduct disorder and said she exhibits unacceptable behavior for a child of her age. It appears Diaz's symptoms first manifested at the time she began her relationship with Salgado. Given Diaz's psychiatric testing, psychological testing, and history, the trial court found Diaz to be emotionally unstable and immature for her age.

[¶27.] Diaz had limited contact with the court system until the investigators in this case questioned her. Prior to police questioning, Diaz had not experienced the criminal side of the legal system nor had she faced delinquency charges that might have involved representation by an attorney or the explanation of her constitutional rights. Diaz did, however, have experience with the Indiana Department of Child Services (IDCS). Diaz had been adjudicated as a child in need of services and before fleeing to South Dakota, was monitored regularly by an IDCS family case manager. In addition, her family case manager explained rules and laws of the United States and the importance of keeping those rules and laws.

[¶28.]        Diaz exhibited average intelligence.  Prior to her truancy from school she received adequate academic marks.  She scored average for IQ and cognitive abilities, above average in nonverbal IQ, and below average in verbal expression.  The reports indicated that her lower verbal expression was more likely a sign of language skills and not the result of a developmental disorder.  Diaz's English reading ability was at the kindergarten level in one test and the third to fourth grade level in another.  Her ability to understand and orally use the English language was at the first to third grade level.  No tests were administered to determine Diaz's proficiency in Spanish.

[¶29.]        Diaz was young, immature, a victim of abuse, and limited in English, but she possessed average intelligence and had some experience with authority.  Her repeated attempts to deceive law enforcement before and during questioning, her fabrication and orchestration of a false story, and her attempts to align her story with Salgado's through the wall of the interview rooms exhibit her understanding of the gravity of the situation.

*The gravity of any misrepresentations used by the interrogating officers*

[¶30.]        The State argues that law enforcement properly advised Diaz of her *Miranda* rights.  Diaz argues that multiple misrepresentations made by law enforcement to Diaz regarding her rights precluded Diaz from knowingly and intelligently waiving her rights.  No precise formulation of the *Miranda* rights is necessary; rather, the inquiry we make is "whether the warnings reasonably convey" the "rights as required by *Miranda*." *Florida v. Powell*, 559 U.S. 50, 60, 130 S. Ct. 1195, 1204, 175 L. Ed. 2d 1009 (2010) (citations omitted).  "In determining

whether a particular warning adequately conveys [these rights], a reviewing court must look to the warnings as a whole rather than focusing on one sentence in isolation." *State v. Rhines*, 1996 S.D. 55, ¶ 28, 548 N.W.2d 415, 428 (citations omitted).

[¶31.] First, Diaz emphasizes that Reinesch misrepresented the importance of her *Miranda* rights when he prefaced the first advisement with, "there's a protocol that I've gotta go through first, okay?  Not a big deal at all and we'll get through this and we'll getcha takin' care of."  Reinesch then read Diaz her *Miranda* rights and asked if she understood.  Diaz replied, "No . . . you talk so fast."

[¶32.] Considering Diaz's limited English and her lack of understanding her rights because of the speed of Reinesch's speech, it is likely Diaz did not fully understand the word "protocol" and what Reinesch was referring to as "not a big deal."  Indeed, upon being asked by Soto whether she understood the rights given by Reinesch in English, Diaz stated, "I don't understand anything[,]" attributing the lack of understanding to her limited English capabilities.  On appeal, Diaz repeatedly makes note of her limited English, but at the same time argues that English words used by Reinesch that downplayed her rights weigh against a knowing and intelligent waiver.  Diaz cannot have it both ways.  Reinesch's prefatory remarks downplaying the importance of Diaz's *Miranda* rights were improper, but we do not agree with Diaz that Reinesch's words poisoned the entire interrogation.  Rather, in looking at the warnings as a whole and Diaz's responses

to those warnings, including her advisement in Spanish, we conclude the warnings were reasonably conveyed.[10]

[¶33.] After Diaz said she did not understand the first reading of the *Miranda* rights because Reinesch talked too fast, Reinesch re-read Diaz her *Miranda* rights and again asked if she understood. Diaz replied, "I think so." Reinesch went on to explain that "basically" Diaz did not have to speak with him if she did not want. To which she replied, "So I don't need – I stay silent also?" Reinesch replied, "You – you can if you want to." After a little more conversation, Diaz says, "I don't know." Soto then asked, "Is there any part of that that you don't understand, the rights that [Reinesch] – that he read to ya?" Diaz replied, "I don't understand anything." Then Soto read Diaz her *Miranda* rights in Spanish and Diaz stated she understood.[11]

[¶34.] Diaz argues that the second reading of the *Miranda* rights in English and the subsequent explanation of the right to remain silent inaccurately summarized those rights and downplayed Diaz's right to an attorney by focusing

---

10. The dissent accuses the Court of both condemning and defending Reinesch's remarks. We disagree. We do not defend the remarks but conclude, in applying the totality of the circumstances, that Diaz knowingly and intelligently waived her *Miranda* rights.

11. The dissent notes that Diaz responded appropriately to some of the questions put to her in English and suggests that the Court inappropriately seizes on Diaz's remark that she did not understand anything Reinesch said. Diaz's appropriate responses to English questions do not confirm she understood the *Miranda* rights Reinesch gave her. Indeed, when she was asked if she understood the rights Reinesch had just given, Diaz twice stated she did not. However, when asked in Spanish, Diaz unequivocally stated she understood. The Court does not seize only on Diaz's statement that she did not understand anything Reinesch said, but rather relies on all of Diaz's remarks, and all the other factors that are required for us to consider.

solely on the right to remain silent.  We agree with Diaz that Reinesch's follow-up explanation of the *Miranda* rights was not thorough in that it did not include explanation of the right to an attorney.  However, although Diaz's response to Reinesch's explanation of the right to remain silent indicates that she understood that right, she stated prior to her Spanish advisement that she did not "understand anything" that Reinesch had said.  Almost immediately following that statement, Diaz received her *Miranda* rights in Spanish, and indicated she understood all of her rights.

[¶35.]       Next Diaz argues that she was misled because the officers suggested to her that they mainly wished to talk about the events in Indiana, rather than Jasmine.  The record is clear that Diaz knew the officers wanted to talk about Jasmine.  After Reinesch told Diaz she did not have to talk with him, he said, "Do you – do you – do you wanna have a conversation with me?"  Diaz replied, "But about me or about . . . Jasmine?"  Reinesch replied, " – everything, everything.  I'd like to talk about you and then, you know, whatever it goes from there, that – that's where it goes."  In addition, after Soto had begun speaking in Spanish and had read Diaz her *Miranda* rights, Soto asked, "Do you want to talk with us?"  Diaz replied, "But, about me?"  Soto said, "About you, about Jasmine, about Alexander, everything."  The officers told Diaz, in both English and Spanish, that they were concerned for her safety and that they wanted to talk to her about what happened back in Indiana, but they also explicitly stated they wanted to talk about Jasmine.

[¶36.]       Finally, Diaz claims the officers used deceptive tactics and misrepresentations regarding Mother's consent to get Diaz to speak with them.  On

two occasions, in both English and Spanish and before asking if Diaz wanted to talk, the officers told Diaz that they had spoken with Mother to obtain Mother's permission to speak with Diaz. Given Mother's statement that Diaz had called Mother that morning and said Salgado beat Diaz and brought her to South Dakota, it was reasonable for the officers to tell Diaz they had Mother's permission to ask Diaz questions. After Soto's conversation with Mother, the officers had learned Diaz was 15 years old, a young mother to Salgado's child, and was a potential physical and sexual abuse victim of Salgado, a man more than five years her senior. Without bypassing the necessary *Miranda* advisements and based on the additional information gathered from Mother, the officers were encouraging Diaz to explain what happened. The officers believed Diaz and Salgado were the last to see Jasmine alive and knew of the potential abuse highlighted by Mother, but the officers could not conclude at that time if Diaz participated in the murder or was a victim herself. In this specific situation, the officers' behavior did not preclude Diaz from knowingly and intelligently waiving her *Miranda* rights.[12]

[¶37.]     While the first two English *Miranda* warnings adequately advised Diaz of her right to stop questioning at any time by advising Diaz she had the *continuing* right to remain silent, we note from the translation of Soto's Spanish advisement that it appears Soto did not inform Diaz of her *continuing* right to

---

12.    Diaz also advances that the failure to contact the Mexican consulate was a violation of Article 36 of the Vienna Convention and should be a factor weighing against a knowing and intelligent waiver. Even if a violation occurred, the exclusionary rule would not apply. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 349, 126 S. Ct. 2669, 2681, 165 L. Ed. 2d 557 (2006) ("Suppression would be a vastly disproportionate remedy for an Article 36 violation.").

remain silent.[13] *See State v. Brings Plenty*, 459 N.W.2d 390, 395-96 (S.D. 1990); *Rhines*, 1996 S.D. 55, ¶¶ 15-17, 548 N.W.2d at 426-27. However, the advisements as a whole and Diaz's responses exhibit she understood that she could stop questioning at any time. During the Spanish advisement, Diaz stated she understood her right to "remain silent." Further, when Soto asked Diaz if she wished to talk in Spanish or English, Diaz replied, "In Spanish so I don't get confused and say too much or too little." Diaz's desire to speak in Spanish so she could limit her answers displays her understanding of her continuing right to remain silent.

[¶38.]       The police conduct Diaz advances to this Court as deceptive or misrepresentative does not rise to the level of misconduct found in other cases involving police misconduct where juveniles' confessions were suppressed. In *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011), the detective's recitation of *Miranda's* warnings consumed 12 pages of transcript. *Id.* at 1003. The detective administering the warnings "downplayed the warnings' significance, deviated from an accurate reading of the *Miranda* waiver form, and expressly misinformed [Defendant] regarding his right to counsel" by ad-libbing that the right to counsel applied only if defendant was involved in a crime. *Id.* Taken together, the Ninth

---

13.    The English translation of Soto's advisement does not include the word "continuing." Because this issue was not presented to the trial court or to this Court, there is no evidence in the record as to whether the Spanish word "permanecer" ("to remain," "to stay") that was used in the Spanish advisement is understood to be a continuing right. Further, although Reinesch's *Miranda* card apparently contained the word "continuing," Soto translated the advisements "just the way they [were] written" from his own *Miranda* card. There is no evidence in the record as to how the rights were written on Soto's *Miranda* card.

Circuit concluded that the *Miranda* warnings given to Doody "were inadequate and his confession was therefore inadmissible." *Id.* at 1023. The facts of this case are materially distinguishable from *Doody*. Here, the *Miranda* warnings were spoken verbatim to Diaz, there was no express misinformation given about the *Miranda* rights, and even if Diaz understood the short explanation by Reinesch regarding Diaz's right to remain silent, it does not equate to the 12-page rambling of the *Miranda* advisement in *Doody*.

[¶39.] In *State v. Horse*, the officers did not even attempt to contact the juvenile's parents or his aunt and refused defendant's request to confer with his adult half-brother. 2002 S.D. 47, ¶¶ 21, 27, 644 N.W.2d at 222, 225. In *State v. Lohnes*, the officers and state's attorney deliberately delayed a hearing in front of the court because they knew the judge would appoint a lawyer and the juvenile would refuse to confess to the murder. 324 N.W.2d 409, 411 (S.D. 1982). In *State v. Caffrey*, the officers, without notifying any family member or adult, continually pressured the juvenile and repeatedly lied to the juvenile that he would be forced to take a lie detector test. 332 N.W.2d 269, 271-72 (S.D. 1983).

[¶40.] None of the actions taken by the officers with Diaz rise to the level of impropriety found in these other cases. The officers continually tried to contact Diaz's parents, gave Mother the opportunity to speak with Diaz, obtained Mother's consent to speak to Diaz, made sure Diaz understood each *Miranda* right prior to asking her to talk to them, gave Diaz the adult advisement, did not deliberately delay a hearing in front of the court but rather obtained a temporary custody directive that same evening, held a hearing the next day, and never lied to Diaz to

get her to talk. Moreover, the nature and tone of questioning throughout was conversational. The officers did not threaten, swear at, or intimidate Diaz. She was fed, well rested, and given multiple breaks.

[¶41.] Diaz's full understanding of her *Miranda* rights as evidenced by the Spanish *Miranda* advisement and Diaz's statement that she understood those rights, Diaz's knowledge that the police wanted to talk with her about Jasmine, the conversational tone of questioning, the time of day, and the relatively short questioning time prior to her confession weigh in favor of a knowing and intelligent waiver.

*Capacity to understand the warnings, the nature of the Fifth Amendment rights, and the consequences of waiving such rights*

[¶42.] Although Diaz possesses average cognitive ability, Diaz's limited abilities in English pose a hardship for her. To aid her understanding of English, she relies on gestures, facial expressions, and repetitions. While Spanish is her stronger language, Diaz appeared to understand most of what the officers said to her, evidenced by her appropriate responses to requests and her attempts to deceive. Nonetheless, the transcript reveals various occasions that exhibit her struggle with concepts and words.

[¶43.] After Reinesch's first advisement, when asked if she understood, Diaz said, "No," explaining that Reinesch spoke too fast. After Reinesch's second advisement, Diaz first indicated that she thought she understood her rights, then moments later told Soto she did not understand "anything," attributing it to her limited English skills and explaining that she understood and knew how to speak

some things in English, but not others. Although she repeatedly lied to the officers, these statements made by Diaz align with her English testing results.

[¶44.] In any event, her capacity to understand the warnings was resolved when Soto administered Diaz her *Miranda* rights in Spanish. After Soto informed Diaz of each right, he confirmed with her that she understood that right. It was only after she affirmatively acknowledged her understanding that Soto moved on to inform Diaz of her next right. When all *Miranda* rights had been given, Soto then asked Diaz if she understood all her rights. Diaz verbally affirmed her understanding.[14] The remainder of the interview took place almost entirely in Spanish. Diaz communicated effectively, providing appropriate answers to questions, and never stated she did not understand what Soto was saying or that she was confused by his statements. She was not under the influence of drugs or alcohol and appeared to be in good health. Diaz was brought to the police department at 1:00 p.m. and stayed there until approximately 10:00 p.m., but was only questioned for approximately an hour and a half prior to confessing.

[¶45.] As noted above, the nature of Reinesch's preface to the advisement did not poison the entire questioning. Reinesch read the rights twice and then

---

14. Amici curiae urge this Court to require police to ask juveniles to explain the *Miranda* rights in their own words prior to obtaining a waiver. Although we agree this practice might be helpful in determining whether a juvenile made a knowing and intelligent waiver, we decline to make it a per se rule. The totality of the circumstances standard dictates whether a juvenile voluntarily, knowingly, and intelligently waives her *Miranda* rights. *Fare*, 442 U.S. at 724-25, 99 S. Ct. at 2571-72; *Horse*, 2002 S.D. 47, ¶ 13, 644 N.W.2d at 218. We have declined to adopt per se rules in the past and we find no reason to do so now. *J.M.J.*, 2007 S.D. 1, ¶¶ 15-16, 726 N.W.2d at 628.

expanded on the right to remain silent.  Although Reinesch omitted the right to an

attorney in his expanded explanation, Soto subsequently provided each of the

*Miranda* rights to Diaz in Spanish to which she stated she understood.

[¶46.]          In addition, the officers adequately advised Diaz that she could be

tried as an adult for any charges stemming from the questioning.  The following

conversation took place in Spanish and exhibits Diaz understood the adult

advisement:

> **Soto:**  And also, another thing that I have to tell you is . . . um . .
> . if these events end up in court, it's possible that they could
> charge you as an adult, as an adult person of –
>
> **Diaz:**  But, what charges?
>
> **Soto:**  Any charge that results from here.  Do you understand?
>
> **Diaz:**  Uh-huh.

[¶47.]          Although Diaz never expressly waived her *Miranda* rights, "[a]n

express verbal or written waiver from a defendant is not required to satisfy the

constitutional requirements of a knowing, intelligent, and voluntary waiver."

*Ralios*, 2010 S.D. 43, ¶ 32, 783 N.W.2d at 657 (citations omitted).  "A valid *Miranda*

waiver can be inferred when the defendant understands the rights and engages in a

course of conduct reflecting a desire to give up those rights."  *Id.* (citations omitted).

[¶48.]          This is a case where two lower court judges reached different

conclusions on the question of Diaz's waiver.  Our de novo review and independent

determination is that Diaz understood her rights.  Prior to giving any incriminating

statements, Diaz was informed of her *Miranda* rights twice in English and once in

Spanish.  Although she stated she did not understand the *Miranda* rights given in

English by Reinesch, after receipt of the *Miranda* rights in Spanish, she stated she

understood those rights. She knew that charges could stem from the questioning and that she could potentially be tried as an adult. Besides the answers she gave to police, her understanding of the situation is evidenced by her repeated questions of whether they were going to talk about Jasmine, her attempts to conspire with Salgado through the wall of the interview rooms, and her attempts to deceive law enforcement.

[¶49.] Diaz also engaged in a course of conduct reflecting a desire to give up her rights. After Soto advised Diaz in Spanish, he asked her if she wished to talk to the officers. The conversation in Spanish continued:

> **Diaz:** But, about me?
>
> **Soto:** About you, about Jasmine, about Alexander, everything.
>
> **Diaz:** About Jasmine, all that I know is that the other day –
>
> **Soto:** First of all, do you want to talk, yes or no?
>
> **Diaz:** Yes.
>
> . . . .
>
> **Soto:** (In English) Okay. Okay, now, do you want to continue speaking in – in English for Joel's benefit? Or do you wanna speak in Spanish?
>
> **Diaz:** (In Spanish) In Spanish so that I don't get confused and say too much or too little.

Without answering whether or not she wanted to talk with the police officers, and with an understanding of her *Miranda* rights, Diaz quickly jumped in to talk about Jasmine. In fact, Soto had to stop her to clarify whether Diaz wanted to talk. Diaz unequivocally said, "Yes." Following up on her desire to talk with the officers, Soto asked whether she wanted to speak in English or Spanish. Diaz preferred Spanish so she did not get confused and say too much or too little. Diaz proceeded with the questioning and ultimately confessed. Indeed, the trial court relied on "Diaz's

apparent willingness to speak with law enforcement" in finding that Diaz made her statements voluntarily. A waiver of *Miranda* rights is implied because Diaz stated she understood her rights and her conduct throughout the questioning reflected a desire to give up those rights.

*Parental notification, consent, and opportunity to confer with juvenile*

[¶50.]     When a juvenile is taken into custody, the officer who takes the juvenile into custody must "immediately, without unnecessary delay *in keeping with the circumstances*," inform the juvenile's parent of the temporary custody and the right to a prompt hearing. SDCL 26-7A-15 (emphasis added); *see also Horse*, 2002 S.D. 47, ¶ 36, 644 N.W.2d at 227 (Gilbertson, C.J., dissenting). If the juvenile's parent cannot be located after reasonable inquiry, the officer taking custody of the juvenile "shall report that fact and the circumstances immediately to the state's attorney." *Id.* The state's attorney shall notify the juvenile's parent, "without unnecessary delay, of the time, date, and place of the temporary custody hearing." *Id.* The hearing shall be held within 48-hours after the juvenile was taken into custody.[15] *Id.* SDCL 26-7A-15 is "[a] crucial statutory safeguard to assure the due process rights of juveniles taken into custody[.]" *Horse*, 2002 S.D. 47, ¶ 17, 644 N.W.2d at 220.

---

15.     SDCL 26-7A-15 outlines that the hearing shall be held within 24 hours if it concerns any apparent child in need of supervision pursuant to SDCL 26-8B-3 or shall be held within 48 hours if it concerns any apparent delinquent child pursuant to SDCL 26-8C-3. SDCL 26-8C-3 applies to juveniles charged with a crime of violence under SDCL 22-1-2(9). Because Diaz was charged by juvenile petition with murder and arson (both crimes of violence), she had the right to a temporary custody hearing within 48 hours from when she was taken into custody. Regardless, Diaz received a hearing the next afternoon.

[¶51.] Here, officers took reasonable action to immediately locate and reach Diaz's mother to inform her of the temporary custody. While it took nearly three hours to do so, none of that delay is attributable to the authorities' conduct. Had Diaz truthfully provided investigators her name, date of birth, and parental contact information at the outset, officers likely would have been in contact with Mother much sooner. Because of the officers' reasonable actions taken to locate Diaz's mother, and the subsequent location of Mother, the officers were not required to contact the state's attorney under SDCL 26-7A-15.

[¶52.] Although consent from Mother to question Diaz is not required,[16] Soto obtained that consent during his conversation with Mother.[17] The trial court concluded that Soto improperly gained consent when he informed Mother that Diaz was a potential witness in another investigation instead of a suspect. However, at that point in the investigation, Soto believed Diaz was only a witness. The investigation had just recently revealed the true identities of Diaz and Salgado and

---

16. Nothing in SDCL 26-7A-15 requires law enforcement to secure consent to interrogate a juvenile. The only requirements that fall on law enforcement are to notify the parent of the "temporary custody and of the right to a prompt hearing by the court to determine whether temporary custody should be continued." SDCL 26-7A-15.

17. **Mother:** (Mother talking to another person in the background) . . . investigation, they are investigating over there and I think another matter, (inaudible) I don't know, but they want permission, for me to talk, for me to give permission for her to talk, since she is a minor they need to say . . . (back speaking with Soto) Well, it's alright, well, you can interrogate her.

also that Diaz was a physical abuse victim of Salgado.[18]  Even imputing the other

officers' knowledge to Soto, he was the only officer privy to the phone conversation

that included Mother's accusations of abuse.  As a result, prior to informing Mother

that Diaz was a potential witness in an investigation, he could not have concluded

whether Diaz was a suspect in the murder or a victim herself.  Further, there is no

statutory requirement in South Dakota that parental notification must include an

explanation of the alleged delinquent act of the juvenile.  We will not add such a

requirement.  *Petition of Famous Brands, Inc.*, 347 N.W.2d 882, 884 (S.D. 1984)

("[C]ourts have no legislative authority, and should avoid judicial legislation, a

18.  The following exchange took place during Soto and Mother's phone conversation, in Spanish, prior to Soto telling Mother that Diaz was a potential witness in an investigation:

> **Mother:**  Today she called me in the morning, at about eleven in the morning.
>
> **Soto:**  And she told you that [Salgado] beat her and brought her over here?
>
> **Mother:**  Yes.  Also, she told me that yesterday he beat her, that he beats her because she does not drink alcohol, or I don't know if he takes drugs.  He forces her, he beats her if she doesn't take it.
>
> . . . .
>
> **Soto:**  And he forced her to be [in South Dakota] right?
>
> **Mother:**  Yes.
>
> . . . .
>
> **Soto:**  Well, they detained her over a, another investigation and she gave us a false name.  She gave us false information.  Well, as if she did not want us to know who she was.
>
> **Mother:**  It's because she is afraid of the police because she says that since she, she went to see him, but he took her by force.  Or the way it is, she went to see [Salgado], to talk with him, but he took her by force and hit her.

usurpation of legislative powers, or any entry into the legislative field."). *Supra* n.9. Prior to giving her consent, Mother was allowed to ask questions of Soto, all of which he answered. She also understood Diaz was detained in another investigation and law enforcement wanted to question Diaz. However, Mother did not ask what the other investigation was about. Soto was not required to get Mother's consent to question Diaz, was not required to explain the details of the investigation, and was not being deceitful when he told Mother that Diaz was a potential witness. Therefore, Soto did not improperly gain Mother's consent.

[¶53.] While Soto did not inform Mother of the right to a prompt hearing regarding Diaz's temporary custody, Mother was eventually informed of the hearing in a manner that allowed her full participation. The record is void of any contact between the state's attorney and Mother regarding the date, time, and place of the hearing. However, a temporary custody hearing was held the following day, well within the 48-hour window for holding such a hearing, with Mother appearing telephonically.

[¶54.] Although parental consent to interrogate is not required under SDCL 26-7A-15, we have said that the purpose of notifying the parent is "to bring the child in contact with a mature adult family member or caretaker." *Horse*, 2002 S.D. 47, ¶ 27, 644 N.W.2d at 225. After Mother gave consent, Soto stated,

> Yes, we can interrogate her. Look, if you want to talk with her, you can talk to her after, or now, or whatever you like, if you have any questions for her. Like I said, she is fine, she is not hurt in any way. But I would like to get your information. We only have the telephone number that we called on. Your name is Irma right? Ma'am?

After obtaining consent, Soto offered Mother the chance to talk with Diaz "after, now, or whatever" Mother preferred. However, Soto did not follow up and ask if Mother would like to talk to Diaz, but instead requested her information.

[¶55.] Then, toward the conclusion of the call,

> **Soto:** . . . I appreciate your permission to talk with the girl and if you would like, you can talk with her later.
>
> **Mother:** Yes if you could dial over here, please my daughter.
>
> **Soto:** Yes, of course. To this telephone right?
>
> **Mother:** Yes, please.

The translation of Mother's answer would indicate she took Soto up on the offer to talk with Diaz "later." Soto testified that he understood this to mean that when officers were done interrogating Diaz, Mother could call if she wanted. Regardless, we conclude that Mother was given ample opportunity during the conversation to speak with Diaz.

[¶56.] The facts do not support a conclusion that the State excluded Mother from consulting with Diaz. In fact, Mother was offered the opportunity to talk with Diaz on two separate occasions, once immediately and the other "later." Although conflicting offers, the record indicates SDCL 26-7A-15's purpose was met: to bring Diaz in contact with a mature adult family member. Law enforcement fulfilled this purpose when it worked to contact Mother and then when it offered Mother the chance to speak with Diaz. In fact, a few moments after Soto had first offered Mother the opportunity to talk with Diaz at any time, Mother told Soto she had a question and asked Soto where the officers caught Diaz and where Diaz was living. After responding, Soto asked Mother if she had any other questions. Mother then asked if the police were going to let Diaz go, if they could send Diaz to Fort Wayne,

if Diaz was there alone, and whether the police also had Salgado there. Mother asked all these questions *after* Soto had told Mother she could speak to Diaz at any time and *prior* to Soto telling Mother that she could talk to Diaz later. It is Mitchell Police Department policy to allow a juvenile and parent to speak with one another if requested, but neither Mother nor Diaz ever requested to speak with each other. Mother was not absent from questioning because of law enforcement's failure to comply with the notice requirement, but rather because she did not request to speak with Diaz even though she knew Diaz was detained over another investigation. Further, Diaz had run away from her mother, left her child with her mother, and been adjudicated a child in need of services while in her mother's custody. The relationship was clearly strained.

[¶57.] When taking a juvenile into custody, our statutes place certain duties on the officer. "Upon taking a child into temporary custody pursuant to [SDCL] 26-7A-12,"[19] law enforcement must "immediately notify an intake officer who shall conduct a hearing pursuant to [SDCL] 26-7A-13." SDCL 26-7A-13.1. Under SDCL 26-7A-13, the court can issue a written temporary custody directive, without noticed hearing, upon application by a state's attorney. In addition, the officer "who takes a child into temporary custody . . . shall notify the state's attorney at the earliest opportunity of the time the child was taken into temporary custody and the location

---

19. SDCL 26-7A-12 provides in part that "[a] child may be taken into temporary custody by a law enforcement officer without order of the court . . . if the child is subject to arrest under the provisions of" SDCL 23A-3-2 (permitting arrest upon probable cause that a person committed a felony or Class 1 misdemeanor) or "if there are reasonable grounds to believe the child has run away[.]"

of the child." SDCL 26-7A-17. The officer "shall also file a written report promptly with the state's attorney stating the facts which caused placement of the child in temporary custody, the identity and age of the child, available information about identities and locations of the child's parents, . . . and if the parents were notified of the action." *Id.* The state's attorney shall then promptly notify the court. *Id.* The trial court concluded, and Diaz argues, that law enforcement's failure to strictly follow these statutes should weigh against a knowing and intelligent waiver. We agree.

[¶58.]    On the evening of the interrogation, without noticed hearing, Judge O'Brien issued a temporary custody directive. The following day, a temporary custody hearing was held. The record does not reflect exactly when the state's attorney and court were notified of Diaz's custody. However, the temporary custody directive was issued at approximately 10:00 p.m. on the evening of the interrogation. Although law enforcement eventually contacted the state's attorney and the state's attorney contacted the court regarding Diaz, its failure to do so immediately after law enforcement learned of Diaz's runaway status fails to conform to statute and weighs against a knowing and intelligent waiver.[20]  Yet,

---

20.    Law enforcement is not required to notify an intake officer every time a juvenile is interviewed by the police, but only if the child is taken "into temporary custody *pursuant to [SDCL] 26-7A-12*." SDCL 26-7A-13.1 (emphasis added). The trial court concluded that law enforcement should have attempted to notify an intake officer immediately when Diaz was taken into custody at 1:00 p.m. However, Diaz was not initially brought in because she was subject to arrest or was a runaway, as is necessary under SDCL 26-7A-12, but she went to the station voluntarily upon request. At 1:00 p.m. when Diaz first arrived at the police station, officers did not know who she was or her involvement in the crime. Until law enforcement learned Diaz's

(continued . . .)

unlike *Lohnes*, the failure to comply with statute was not intentional, but was an oversight in the heat of a fast-moving, grisly murder investigation.

*Application of the Totality of the Circumstances*

[¶59.]     The totality of the circumstances standard allows the court to evaluate all the facts without reliance on a mechanical or rigid standard to resolve the question of whether the prosecution has, in a given case, met its burden to establish that a juvenile's purported consent was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421, 106 S. Ct. at 1141.

[¶60.]     Considering the totality of the circumstances, we do not ignore that Diaz is a 15-year-old girl, a victim of sexual and physical abuse, and one who exhibited immature adolescent behavior. We also take note of the timing of law enforcement's procurement of a temporary custody directive and its lack of strict compliance with SDCL 26-7A-13.1 and related statutes. Plus, we note that Officer Reinesch made prefatory remarks downplaying the importance of the *Miranda* rights. However, Diaz is of average intelligence, has many adult experiences, has some limited experience with state authority, received her *Miranda* rights twice in English and once in Spanish, stated she understood those rights, and exhibited a clear willingness to speak with the officers. She also repeatedly attempted to

_____

(. . . continued)

true identity and her runaway status, there was no duty on the police officers pursuant to SDCL 26-7A-13.1. When law enforcement learned of Diaz's runaway status at approximately 3:30 p.m. it became subject to SDCL 26-7A-13.1's mandate to immediately contact an intake officer concerning the temporary custody.

deceive the officers by lying about her age, name, and whereabouts. She even conspired with Salgado through the wall of the interview rooms in order to better deceive law enforcement. Diaz was not under the influence of drugs or alcohol at the time of the questioning, the questioning was conversational with no threats made to Diaz, and the time of day and length of questioning were reasonable.

[¶61.]    This is a case where the facts are essentially undisputed. Our obligation is to make a de novo review of the application of a legal standard to those facts. No one factor preponderates. Taken in totality, we conclude that the State met its burden to show more likely than not that Diaz's waiver of her *Miranda* rights was "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Thus, the trial court erred in suppressing Diaz's confession.

[¶62.]    Reversed and remanded.

[¶63.]    GILBERTSON, Chief Justice, and SEVERSON, Justice, concur.

[¶64.]    ZINTER, Justice, concurs with a writing.

[¶65.]    KONENKAMP, Justice, dissents.


ZINTER, Justice (concurring).

[¶66.]    The Court and the dissent emphasize the heightened concerns that exist when juveniles are subject to police interrogation. Both correctly stress the "special care" we take in scrutinizing the record in juvenile cases. On this record, however, I join the Court's thorough analysis of the totality of the circumstances. I

write only to highlight the evidence that, in the final analysis, reflects a knowing and intelligent waiver of Diaz's *Miranda* rights.

[¶67.]    Diaz stated that she did not understand the two improper *Miranda* advisements that Officer Reinesch gave in English. Significantly, Diaz told Reinesch and Officer Soto that she did not understand what had been said by Reinesch because of her limited English. Therefore, Soto stepped in to explain Diaz's *Miranda* rights in Spanish. Soto then clearly and concisely advised Diaz of each *Miranda* right, one by one. And after each right was read, Diaz indicated that she understood that right. What immediately followed is also significant. Soto then clarified for Diaz that questions would pertain to Jasmine. Although Diaz responded by starting to talk about Jasmine, Soto stopped her, to confirm that she wanted to talk. Diaz confirmed she did. Before allowing her to continue, however, Soto further explained that Diaz could be charged as an adult, for "[a]ny charge that results from here"; an explanation Diaz also indicated she understood. Soto finally asked Diaz whether she would like to continue. Diaz responded that she wanted to talk in Spanish "so that [she would not] get confused and say too much or too little." This conversation between Soto and Diaz—a conversation in Spanish because Diaz did not understand Reinesch's advisements in English—is critical. It clearly reflects that Diaz knowingly and intelligently waived her *Miranda* rights and decided to speak with the officers about Jasmine. On this record, I join the opinion of the Court.

#26544

KONENKAMP, Justice (dissenting).

[¶68.]     If we are to preserve the integrity of our juvenile justice system, we cannot support law enforcement tactics that mislead children into believing that waiving their *Miranda* rights is "not a big deal at all."  Nor can we encourage deceiving parents about the true reason police seek to question their children.  Our Court today upholds these practices.  And nowhere in its decision to reverse does the Court explain how the trial court erred in ruling inadmissible a statement in which these tactics were used against a fifteen year old and her mother.

[¶69.]     The burden rests on the State to show that an accused "knowingly and intelligently waived [her] privilege against self-incrimination and [her] right to retained or appointed counsel."  *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S. Ct. 1602, 1628, 16 L. Ed. 2d 694 (1966); *see State v. Tuttle*, 2002 S.D. 94, ¶ 9, 650 N.W.2d 20, 26.  Proof only that a person in custody was given *Miranda* warnings and made an uncoerced statement, "standing alone, is insufficient to demonstrate 'a valid waiver[.]'"  *Berghuis v. Thompkins*, 560 U.S. 370, 384, 130 S. Ct. 2250, 2261, 176 L. Ed. 2d 1098 (2010).  The State must make the further showing that the accused understood and gave up these rights.  *Id.*  We take special care with children.  As our Court said in *State v. Caffrey*, "[a] juvenile's constitutional right against self-incrimination should be afforded additional protection.  If counsel is not present when an admission is obtained, a court must take great care to assure that the juvenile's confession was voluntary 'in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair.'"  332 N.W.2d 269, 272 (S.D. 1983) (quoting *In*

-39-

*re Gault*, 387 U.S. 1, 55, 87 S. Ct. 1428, 1458, 18 L. Ed. 2d 527 (1967)) (internal citation omitted).

### Use of Deception Against Parent and Child

[¶70.]     When the officers called Maricela Nicolasa Diaz's mother, they knew Maricela had been lying about her age and identity. They knew that she had been involved in a prior altercation with the victim, and they knew that she was seen with the victim just hours before her death. Yet they did not tell the mother the real reason they wanted to talk to her daughter, only that there was a "separate investigation" in South Dakota. They told the mother that "it is possible that [Maricela] is a witness to what happened," without saying what it was that happened. At the end of the conversation, Detective Soto told the mother, "I appreciate your permission to talk with the girl and if you would like, you can talk with her later." They never told the mother that they would then be seeking to have Maricela waive her *Miranda* rights in connection with a murder.

[¶71.]     Our Court excuses Detective Soto's misrepresentations because he testified that he personally believed Maricela was only a possible witness at that time. The trial court found that Soto's misrepresentation was unintentional because he "had limited information about the facts[.]" But the court found nonetheless that "the investigation had by then established that [Maricela] was far more than a 'possible witness.'" Two other investigators knew this, Detectives Reinesch and Russell, and one officer's knowledge of a fact is generally imputed to the other investigating officers. *See, e.g., State v. Middleton*, 399 N.W.2d 917, 924 (Wis. 1986) (citing cases), *overruled on other grounds by State v. Anson*, 698 N.W.2d

776 (Wis. 2005). Without this rule, one investigator, "unaware" of the details, could freely make inaccurate or misleading statements without any consequence.

[¶72.] More conspicuously, Detective Soto deliberately withheld from the mother that her daughter was to be questioned about a murder. He later testified, "I don't tell people what the investigation is about." And, as Maricela's hours-long interrogation evolved, the officers never called the mother back to inform her that her child's *witness* status had changed to that of a *suspect*. The trial court concluded: "It is difficult to imagine how a parent can meaningfully consent to her child being questioned in a serious criminal investigation, without knowing that she is indeed a suspect in the case rather than merely a 'potential witness.'" Our Court gives this no import because our statutes do not strictly require parental consent.[21] That misses the point.

[¶73.] Why is the police deception of the mother crucial here? Because, whether intentional or not, this deception — withholding from the mother the real reason they wanted to talk to her daughter — set the stage for using the mother's permission to convince Maricela to speak to the officers. Fortified with the mother's uninformed consent, they plied Maricela by saying repeatedly that her mother said it was okay to talk to her. Here is Detective Reinesch (speaking in English): "I spoke with your mom, Irma, a little while ago and she said it was okay to talk to you." And Detective Soto (speaking in Spanish) reinforced the same ploy: "I spoke

---

21. If police in South Dakota can question children without their parents' consent or even their knowledge about the subject of the interrogation, one must wonder how serious a "level of impropriety" or "level of misconduct," to use this Court's terms, will be tolerated in future secret interrogations.

with your Mom, Irma, a little while ago and she said it was okay to talk to you."

And again later, Detective Soto: "Do you want to talk to us about the events? Yes or no? Because your — I already spoke to your mom and she said that we can talk to you about what happened and all the events with the family, with Alexander. Do you want to talk to us?" Our Court brushes past this obvious tactic that when the officers asked Maricela if she wanted to "talk," they coupled it with the assurance that her mother said "it was okay to talk to you."

[¶74.]     Maricela had turned fifteen only two months before. She had telephoned her mother earlier that day, as she occasionally did, this time saying that Salgado (her adult boyfriend) had physically abused her. Now she was being told that her mother thought it was okay for her to talk to the police. In fact, immediately after Detective Soto's remarks, Maricela agreed to answer the officers' questions. Children are more susceptible to police interrogation techniques, as Justice Sotomayor explained: "It is beyond dispute that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave." *J.D.B. v. North Carolina*, ___ U.S. ___, 131 S. Ct. 2394, 2398-99, 180 L. Ed. 2d 310 (2011). Thus, the principle we held important in *State v. Horse* — that children need an opportunity for adult or legal guidance before deciding to relinquish their fundamental rights — was twisted here to create the suggestion that Maricela's mother thought it was okay for her to give up her

rights.[22] *See* 2002 S.D. 47, ¶¶ 17, 27, 644 N.W.2d 211, 221, 225. But the deceptive tactics did not end there.

[¶75.] Just before giving Maricela her *Miranda* rights, Detective Reinesch told her, "[T]here's a protocol that I've gotta go through first, okay? Not a big deal at all and we'll get through this and we'll getcha takin' care of." In pardoning this blatant minimization of constitutional rights, the Court declares, "it is likely [Maricela] did not fully understand the word 'protocol,' and what Reinesch was referring to as 'not a big deal.'" Two law enforcement officers testified that from their observations and her responses, Maricela appeared to understand everything they spoke to her in English. But the Court seizes on a remark Maricela made to Detective Soto — "I don't understand anything" — as a reason to isolate Detective Reinesch's deceptions. A review of the interrogation transcript, however, reveals that she responded appropriately in English to each of the numerous questions put to her in English. Detective Soto observed that she was "talking just fine" in English with Reinesch. And even if she did not know the word "protocol," how does that prove she did not understand "not a big deal at all"? From the testing done with her, she demonstrated up to a third grade level of spoken English comprehension. What first, second, or third grader does not understand the meaning of *no big deal*?

_____

22. The circuit court concluded "that in asking [Maricela] whether she wished to speak with them, investigators invoked the consent her mother gave them. The problem is . . . the consent mother gave was for police to question her daughter as a 'possible witness,' rather than for the real purpose for which authorities wanted to question her."

[¶76.]    Our Court concedes that these "prefatory remarks downplaying the importance of [Maricela's] *Miranda* rights" were improper, but, after this passing reproach, it still upholds them.  It accuses Maricela of wanting "it both ways," yet the Court at once both condemns and defends these improper police tactics.  Such practices would be questionable even when used against a seasoned adult suspect.  *See, e.g., Ross v. State,* 45 So. 3d 403, 428 (Fla. 2010).  Maricela, at age fifteen, had no experience in the criminal justice system.  Her only contact with courts was as a child in need of supervision.  She had never before been given a *Miranda* advisement.  She had never been represented by a lawyer.  Yet the Court, citing her puerile attempts to mislead the officers, deems her to have sufficient understanding to waive her *Miranda* rights, as if being a dislocated child of an illegal immigrant, a sexually and physically abused runaway, an emotionally unstable, immature, and conduct-disordered youth, somehow made her better capable of understanding the ominous consequences of relinquishing her fundamental rights.

[¶77.]    This error, presuming adult capabilities from adolescent maladjustment, is the type of error the United States Supreme Court warned against: "It would be ironic if these assumptions that we so readily make about children as a class — about their inherent differences from adults in their capacity as agents, as choosers, as shapers of their own lives — were suddenly unavailable" because a child emulates dysfunctional adult behavior.  *See Thompson v. Oklahoma,* 487 U.S. 815, 825 n.23, 108 S. Ct. 2687, 2693 n.23, 101 L. Ed. 2d 702 (1988).

[¶78.]    As it might serve to buttress its claim that Maricela knowingly and intelligently waived her *Miranda* rights, the Court attempts to depict her as being

adept beyond her years.[23]  In the trial court's decision, however, it concluded that she was "an emotionally unstable teenager . . . immature for her age," and her futile attempts to deceive law enforcement officers displayed "naive immaturity."  Expert opinion supported this view.  Dr. David Bean, an evaluating psychiatrist, concluded that "her 'mental maturity' is much less than one would expect from a 15-year-old child in our society."  This Court's strained effort to portray Maricela as other than the troubled and immature child the police interrogated serves to demonstrate how tenuous its decision is.

[¶79.]     In another ploy to downplay the nature of Maricela's *Miranda* rights, Detective Reinesch, as the circuit court found, "inaccurately summarized those rights by focusing solely on the right to remain silent[.]"  Here again is Detective Reinesch:

> Okay and -- and -- basically -- basically what it is, Maricela, is, is you have the right to -- to not tell me whatever you don't wanna tell me.  If you don't wanna tell me somethin', you don't have to, okay?  That's basically you know, what it is?  You know, I'd like to sit down and have a conversation with ya, you know, especially about the stuff that's been goin' on from, you know, from Indiana and stuff like that, you know, as far as you know, you callin' mom today and stuff like that.  That's what I'd like to talk to you about, okay?  But you have the right to not talk to me, okay?  That's basically what I'm reading to ya.  Do -- do you understand that?
>
> **Maricela:** So I don't need -- I stay silent also?
>
> **Reinesch:** You -- you can if you want to.  Do you -- do you -- do you wanna have a conversation with me?  That's basically what I'm talkin' about, Maricela.

---

23.  The psychologist's opinion that Maricela is "oppositional, resistant, sneaky, underhanded," etc., cautioned that these were merely "*possible personality trait*[*s*]" shown in her psychological testing.  (Emphasis added.)

This misdirection along with the "mischaracterization" of rights, as the trial court called it, made no mention of the right to first consult with a lawyer or the continuing right to stop and consult with one.  It centered on whether Maricela wanted to "have a conversation" without mentioning the need to first waive the rights *Miranda* afforded her.  Our Court overlooks the rule that a *Miranda* waiver is only valid if it "was the product of a free and deliberate choice rather than intimidation, coercion, or *deception*."  *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986) (emphasis added).

[¶80.]      Maricela never explicitly waived her *Miranda* rights, but the Court nonetheless finds an *implied* waiver.  Finding such a waiver here sets a regrettable precedent in juvenile law.  Maricela was repeatedly asked whether she wanted merely "to talk" to the officers.  Detective Soto: "And do you want to talk to us about the events that we -- yes or no?"  Detective Soto: "Do you want to talk to us about the events?  Yes or no? . . . Do you want to talk to us?"  Detective Soto: "First of all, do you want to talk, yes or no?"  And finally, Detective Soto: "Okay, now, do you want to continue speaking in -- in English for [Reinesh's] benefit?  Or do you wanna speak in Spanish?"  No mention here about "waiving" her rights.  She was never asked to waive them.  Wanting to talk and wanting to waive one's *Miranda* rights *before* talking are separate matters the Court seeks to merge, and Maricela, being immature and inexperienced, would not likely have grasped the distinction.  This is especially true given the deceptions and rights minimization used against her.  As the trial court concluded, "the manner used first to minimize these rights and then to explain them in a way that excluded reference to [Maricela's] right to the

continuing presence of an attorney, and finally to ask simply if she wished to talk with them in English or Spanish, rather than whether she wished to 'waive these rights and talk to us' or some similar question" made any waiver untenable. Our Court absolves all these improper tactics as falling short of a necessary "level of misconduct[.]"

[¶81.] Lastly, the trial court concluded that "[l]aw enforcement's failure to comply with the provisions of SDCL 26-7A-13, [SDCL] 26-7A-13.1, [SDCL] 26-7A-15, and [SDCL] 26-7A-17," requiring "immediate" notice to the juvenile court or intake officer of a child taken into custody, was also a factor "weighing against a knowing and voluntary waiver of [Maricela's] *Miranda* rights."

[¶82.] Maricela was on "unequal footing" with her police interrogators. *See Gallegos v. Colorado*, 370 U.S. 49, 54, 82 S. Ct. 1209, 1213, 8 L. Ed. 2d 325 (1962). Juveniles "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them." *J.D.B.*, ___ U.S. at ___, 131 S. Ct. at 2403 (citation omitted). To compensate for youth and immaturity, we examine "the juvenile's age, experience, education, background, and intelligence, and into whether [she] has the capacity to understand the warnings given [her], the nature of [her] Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 2572, 61 L. Ed. 2d 197 (1979). As the trial court correctly found here, in its exhaustive seventy-nine page decision, these factors weighed against finding a knowing and intelligent waiver.

**Children Should Not be Treated Like Adults**

[¶83.]     We know that juveniles "may lack the sophistication, knowledge, or maturity to understand the ramifications of an admission." *In re J.M.J.*, 2007 S.D. 1, ¶ 14, 726 N.W.2d 621, 627-28.  Indeed, our laws prohibit children from making potentially life-changing decisions they are not yet ready to make in such areas as contract formation, blood donation, school attendance, marriage, and alcohol consumption.  *See* SDCL 26-2-1 (contract formation); SDCL 26-2-7 (blood donation); SDCL 13-27-1 (school attendance); SDCL 25-1-9 (marriage); SDCL 35-9-1, -2.3 (alcohol consumption).  The United States Supreme Court has consistently recognized that "[t]he law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them." *J.D.B.*, ___ U.S. at ___, 131 S. Ct. at 2403.  These concepts underlie the entire basis for our separate juvenile court system.  Yet the "special care" we are required to take in scrutinizing juvenile cases will remain illusory today.  *See Gallegos* 370 U.S. at 53, 82 S. Ct. at 1212.

[¶84.]     This decision will surely influence how law enforcement officers handle children in the future.  Trickery and deception may perhaps have their place in seeking admissions from adult suspects, but not with children.  *Horse*, 2002 S.D. 47, ¶ 16, 644 N.W.2d at 220.  Will South Dakota no longer recognize the difference?  In the words of the trial court, "[i]t is difficult to identify any meaningful way in which investigators treated [this fifteen-year-old] differently from an adult. . . ."  These

same words can be echoed here as well: it is difficult to identify any meaningful way in which our Court treats this child differently from an adult.

[¶85.] Judicial decision making is a profoundly human undertaking. And being human, our decisions often tread on the edge of uncertainty. We bear a moral obligation, therefore, to never forget that we may be mistaken. That is why we afford, especially with children, "every reasonable presumption against waiver" of constitutional rights. *See Brewer v. Williams*, 430 U.S. 387, 404, 97 S. Ct. 1232, 1242, 51 L. Ed. 2d 424 (1977). These presumptions were not followed here; they were merely swept aside, and I dissent.