#27432-a-LSW
**2016 S.D. 78**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA, Plaintiff and Appellee,

v.

MARICELA DIAZ, Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
HANSON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE TIMOTHY W. BJORKMAN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
Assistant Attorney General
Pierre, South Dakota

Attorneys for plaintiff
and appellee.

CHRIS A. NIPE
Mitchell, South Dakota

        and

DOUGLAS M. DAILEY
Mitchell, South Dakota

Attorneys for defendant
and appellant.

* * * *

ARGUED ON
OCTOBER 3, 2016
OPINION FILED **11/22/16**

#27432

WILBUR, Justice

[¶1.] Defendant appeals her conviction of the 2009 murder and kidnapping of Jasmine Guevara. Defendant, a juvenile at the time of the crime, challenges the transfer of her case to adult court, this Court's previous decision reversing the suppression of statements she made to law enforcement, the circuit court's instructions on imminent fear, and her 80-year sentence with no time suspended. We affirm.

## Background

[¶2.] On November 10, 2009, law enforcement officers and firefighters responded to a vehicle fire in a wooded area of Hanson County near Mitchell, South Dakota. After extinguishing the fire, they discovered a badly burned body in the vehicle's trunk, later identified as 16-year-old Jasmine Guevara. The autopsy revealed that Guevara had been burned alive.

[¶3.] After tracking the ownership of the vehicle to Guevara, law enforcement reached out to the public for any information on Guevara's whereabouts on November 10, 2009. A citizen witness relayed that she had seen Guevara at Walmart with two Hispanic individuals. The tip led officers to Alexander Salgado and Maricela Diaz. Salgado and Diaz had arrived in Mitchell from Indiana the month before, in October 2009. Diaz was 15 years old; Salgado was 21 years old. Diaz and Salgado, who were in a relationship with each other, were staying in Mitchell with an acquaintance, Steffany Molina.

[¶4.] On November 12, 2009, Investigators Joel Reinesch and Dean Knippling located Diaz and Salgado at Molina's house. The two agreed to go with

the officers to the Mitchell Police Department. At the police department, Investigator Toby Russell attempted to obtain identifying information from Diaz so he could contact Diaz's parents. Diaz gave Investigator Russell false information multiple times. Investigator Russell eventually contacted Diaz's mother, Irma Gutierez-Placencia. Officer Hector Soto of the Sioux Falls Police Department spoke with Gutierez-Placencia in Spanish and obtained Gutierez-Placencia's consent to talk to Diaz.

[¶5.]     The officers returned to the interview room and informed Diaz that her mother had given them permission to question her. Investigator Russell told Diaz her *Miranda* rights in English, but Diaz indicated she did not understand what was being said. Diaz spoke limited English. She had emigrated with her mother from Mexico to Indiana when she was 11 years old. Officer Soto then told Diaz her rights in Spanish. Diaz agreed to speak to the officers. For a more extensive description of Diaz's waiver of her *Miranda* rights, see *State v. Diaz* (*Diaz I*), 2014 S.D. 27, 847 N.W.2d 144. In a separate interview room, Salgado also waived his *Miranda* rights and agreed to speak to the officers.

[¶6.]     Diaz informed the officers that shortly after arriving in Mitchell, she and Salgado met Molina's neighbor, Guevara. Neither Diaz nor Salgado was employed. Diaz explained that Guevara helped Diaz and Salgado with money, food, clothing, and transportation, and gave them tips for finding jobs. Guevara would also hang out with Diaz and Salgado. But Diaz suspected Salgado and Guevara had romantic interests in each other. Diaz told the officers that she and Salgado made a plan to kill Guevara and burn all the evidence. She said the plan originated with

Salgado and she cooperated because she was mad at and afraid of Salgado. Diaz also claimed that Salgado agreed to kill Guevara to prove his love to Diaz.

[¶7.]     Diaz told the officers that on the day of Guevara's murder, Diaz asked Guevara to give Diaz and Salgado a ride to Walmart to purchase lighter fluid. Diaz and Salgado told Guevara that the lighter fluid was for a cookout and invited Guevara to attend with them. Before Guevara picked them up at Molina's house, Diaz and/or Salgado hid two kitchen knives within their clothing. After Guevara purchased the lighter fluid at Walmart for Diaz and Salgado, Diaz and Salgado told Guevara to drive to an area referred to as the "haunted house" in rural Hanson County.

[¶8.]     Diaz claimed that it was Salgado's idea that he would get out of the car at the haunted house and Diaz was to start the murder. Salgado disagreed that the murder was his idea. He claimed that Diaz wanted Salgado's help to kill Guevara to prove his love for Diaz. Salgado told the officers that after he exited the vehicle, he returned to the car when he heard Guevara screaming. Diaz claimed that she attempted to stab Guevara, but was unable to follow through. She said Salgado entered the car and grabbed Diaz's knife from her. Diaz also said that her knife broke and Salgado used his own knife. Salgado, however, said that Diaz stabbed Guevara. He admitted that he also stabbed Guevara. Diaz claimed that after Salgado stabbed Guevara in the neck, he picked her up and put her in the trunk of the vehicle. He doused Guevara with lighter fluid. Salgado claimed that Diaz helped him get Guevara into the trunk. It is undisputed that Guevara was still

alive when Salgado and/or Diaz set the vehicle ablaze. Guevara ultimately died of smoke inhalation.

[¶9.] Diaz told the officers that, after setting the vehicle on fire, Diaz and Salgado walked approximately eight miles to Molina's house. Diaz threw the gloves she was wearing into a ditch while they were walking and she tossed her sweatshirt on the railroad tracks in Mitchell. Diaz claimed Salgado threw Guevara's phone in a river. Once they arrived at Molina's house, Diaz and Salgado washed themselves and used bleach on their hands to remove the blood stains. According to Molina, Diaz and Salgado acted normally that night at home.

[¶10.] Ultimately, law enforcement arrested Salgado and Diaz for the kidnapping and murder of Guevara. Salgado pleaded guilty to second-degree murder and agreed to testify against Diaz as part of his plea agreement. On November 17, 2009, the State charged Diaz in juvenile court with first-degree murder, first-degree murder—felony murder: arson, and first-degree arson. Diaz moved to suppress her statements to law enforcement. After a hearing, the juvenile court denied Diaz's motion.

[¶11.] The State moved to transfer Diaz's case to adult court. At the transfer hearing, Salgado testified against Diaz. He explained that he first met Diaz through Diaz's brothers. Salgado was 19 years old; Diaz was 13 years old. Salgado testified about their relationship. He offered that he did not hit Diaz at first, but after he learned that she cheated on him, he got angry and hit Diaz. Salgado tried to end the relationship. He claimed Diaz said she would rather be dead than be without him and tried to kill herself. Salgado admitted that he was in the bathroom

with Diaz while she tried to cut her wrists. Salgado helped her cut her wrists and then left her bleeding in the bathroom. Salgado knew Diaz was pregnant. Others found Diaz and took her to the hospital. Salgado explained that he went to the hospital and renewed their relationship. After this incident, and because Diaz was pregnant, child protection services in Indiana became involved and directed Diaz and Diaz's family that Diaz was to stay away from Salgado. Salgado testified that Diaz defied her mother and child protection services. Diaz would skip school and sneak out of her house to see Salgado.

[¶12.] In July 2009, Diaz gave birth to Salgado's baby. Diaz was 14 years old. After their baby was born, Diaz and Salgado lived together in Salgado's mother's home. Salgado again physically abused Diaz. He testified that Diaz tried to kill herself and cut her wrists again. According to Salgado, Diaz thought Salgado was cheating on her and moved back into her mother's home. She and Salgado continued to spend time with each other. At some point, Salgado's mother kicked him out of her home, and Salgado told Diaz that he was going to leave Indiana for a job, and he would send her money. According to Salgado, Diaz said she would kill herself if Salgado left without her. Salgado let Diaz go with him. They planned to travel to Mitchell, South Dakota by bus.

[¶13.] Salgado testified that Molina picked them up at the bus station in Mitchell in October 2009. According to Salgado, Diaz became jealous of Salgado looking at Molina at the bus station and she yelled at him. Diaz also became jealous of Salgado's interactions with Guevara. They had met Guevara their first night in Mitchell when Molina hosted a party. Salgado testified that he and Diaz

would physically fight because of Diaz's jealousy. One fight occurred two nights before Guevara's murder. Diaz, Salgado, Molina, and Guevara were together at Guevara's boyfriend's house for a party. Diaz had accused Salgado of looking at Guevara, and Diaz tried to punch him and hit him with her elbows. She then yelled at Guevara and wanted to fight her. Diaz eventually calmed down and they all left the party.

[¶14.] The next morning, Diaz suspected Salgado was talking to Guevara outside a pawn shop. According to Salgado, Diaz threatened to fight and kill Guevara. Salgado testified that he did not believe Diaz. He explained that the next day Diaz repeated that she planned to kill Guevara. Salgado testified that he and Diaz watched "A Thousand and One Ways to Die" on television that evening. According to Salgado, the show described how to get rid of evidence by burning someone in the trunk of a car. Salgado testified that Diaz said that she would burn Guevara in the trunk of a car. Salgado explained that he agreed to help Diaz because he felt that if he did not Diaz would believe Salgado was sticking up for Guevara and become more jealous. Salgado then testified in detail regarding the murder of Guevara.

[¶15.] In opposition to the State's motion to transfer her case to adult court, Diaz's counsel had asked Reclaiming Youth International (RYI) to perform a developmental audit on Diaz and make a recommendation to the juvenile court whether Diaz's best interests would be served in the juvenile or adult system. The State asked Dr. Travis Hansen to evaluate Diaz and generate a report containing his psychiatric findings. The State also requested that Dr. Donald Dutton examine

Diaz and review RYI's report. Dr. Dutton specializes in domestic violence. These and other expert witnesses testified about Diaz's mental state, her youth, the fact she was a victim of sexual abuse by Salgado, and about the rehabilitative potential of the State's juvenile and adult prison systems.

[¶16.]     In the juvenile court's written findings, it noted the discrepancies in Diaz's statements to law enforcement, RYI, Dr. Hansen, and Dr. Dutton. Despite the conflicting evidence, the court found undisputed that Diaz exhibited a premeditated plan to kill Guevara. The court disagreed that Diaz acted against her will or that Diaz was under duress. Although the report from RYI maintained that Salgado had dominion over and control of Diaz and that Diaz experienced "trauma" because of her relationship with Salgado, the court found more persuasive the statements Diaz made to Drs. Dutton and Hansen. The court wrote,

> Notably, [Diaz] only told Dr. Bean and the RYI team that Salgado forced her to help with the murder. In her interviews with Dr. Hansen, Dr. Dutton, and law enforcement, [Diaz] said that the plan originated with Salgado. She did not state, however, that he forced her to assist him. Salgado's acknowledged responsibility for Jasmine's murder does not obviate the fact that [Diaz], at the very least, aided Salgado in the planning and was an active participant in the murder itself.

The court concluded that Diaz was not under Salgado's control at the time of the murder. The court also concluded that the prosecutive merit against Diaz was substantial. In consideration of Dr. Hansen's and Dr. Dutton's testimony, the RYI developmental audit, Diaz's statements to law enforcement, and other witness testimony, the court found that it would be contrary to Diaz's best interests and the public to retain jurisdiction in juvenile court.

[¶17.] In June 2011, the court granted the State's motion to transfer Diaz to adult court. On October 14, 2011, Diaz moved the circuit court to vacate the transfer order because Diaz discovered that one of the State's experts, Dr. Dutton, had been accused of sexually assaulting a student. After a hearing, the court denied Diaz's motion. In adult court, a Hanson County grand jury indicted Diaz on six counts: (1) first-degree murder, (2) conspiracy to commit first-degree murder, (3) first-degree murder—felony murder (arson), (4) first-degree arson, (5) first-degree murder—felony murder (kidnapping), and (6) second-degree aggravated kidnapping. Diaz pleaded not guilty to all charges.

[¶18.] Diaz again moved to suppress the statements she made to law enforcement. The court granted Diaz's request to reconsider the juvenile court's suppression decision and, after a hearing, granted Diaz's motion to suppress the statements. The court concluded that Diaz did not knowingly and intelligently waive her *Miranda* rights. In November 2012, the State filed a petition for an intermediate appeal, which this Court granted. In May 2014, this Court in a divided decision reversed the circuit court's suppression of Diaz's statements. *Diaz I*, 2014 S.D. 27, 847 N.W.2d 144.

[¶19.] A jury trial began on December 29, 2014, and concluded on January 15, 2015. Over thirty witnesses testified. Nick Rehorst of the Alexandria Fire Department testified about responding to the fire call, extinguishing the fire, and locating Guevara's body in the vehicle's trunk. Two witnesses testified about surveillance footage from Walmart capturing Diaz, Salgado, and Guevara at Walmart on November 10. The jury observed the footage in conjunction with the

witness testimony. Multiple officers testified and explained their roles in the investigation. These roles included: identifying the owner of the car; speaking to Guevara's mother and boyfriend; speaking to witnesses who observed Diaz, Salgado, and Guevara at Walmart; searching for evidence from the scene; obtaining evidence from Diaz's person; obtaining evidence to identify Guevara's DNA; performing DNA testing on the evidence obtained; seizing and securing the vehicle for inspection; etc.

[¶20.]     Special Agent James Severson testified that he recovered Guevara's cell phone in the river and Diaz's gloves and hooded sweatshirt on the route Salgado and Diaz walked from the fire to Mitchell. Kevin Winer, the Chief Criminalist Supervisor at the Kansas City Police Department Crime Lab, testified about the bloodstain patterns on two sweatshirts recovered during the investigation. One sweatshirt belonged to Diaz and the other to Salgado. A blood stain pattern, according to Winer, is "a grouping of individual bloodstains that either by their shape, their form, their location, their distribution, suggests they were deposited by a single event or a series of events overlapping one another." Winer then described the different types of bloodstain patterns and the indications gleaned from those patterns.

[¶21.]     Winer testified that the DNA testing indicated that the bloodstains on the two sweatshirts were from Guevara. In regard to Diaz's sweatshirt, Winer testified that the front of the sweatshirt contained five or six spatter bloodstains. The left sleeve on the front side contained either a spatter stain or a transfer stain. A transfer stain, according to Winer, is "a bloody object coming in contact with a surface[.]" A spatter stain is:

a general term that's used to describe blood that has traveled through the air and landed on a surface. . . . It's not blood that's just simply falling down due to the force of gravity. There's some other force involved that propels it through the air and lands on a surface.

Winer also noticed additional transfer stains indicating "some wiping or swiping action that's taking place; again, evidence of a bloody object coming in contact with a surface, or multiple different bloody objects." The left cuff of the same sleeve, on the palm side, also contained a transfer stain. Winer testified in regard to certain stains on the back of Diaz's sweatshirt and could not opine conclusively if the stains were transfer or spatter. On the back elbow, however, Winer testified that the sweatshirt contained a transfer stain.

[¶22.] Based on Winer's examination of Diaz's sweatshirt, he concluded that "there's evidence of the - - presumably, the wearer of this garment coming in contact or manipulating one or more bloody objects, leaving the bloodstains behind in a transfer mechanism or a swipe and wipe[.]" In regard to the spatter stains, Winer opined that "[y]ou can tell that these were dropped - - or deposited due to the force of - - some force propelling them through the air and landing on the garment, but the specific type of mechanism cannot be determined."

[¶23.] Investigator Russell and Officer Soto testified about their interrogation of Diaz and Diaz's incriminating statements. Investigator Russell testified that Diaz appeared calm and not afraid. He attempted to explain Diaz's rights to her, but she indicated she did not understand. Officer Soto testified that after being informed of her rights in Spanish, Diaz waived them. He believed Diaz felt more comfortable speaking in Spanish and the questioning continued in Spanish. Officer

Soto testified that Diaz did not claim that she was threatened by Salgado or that she was afraid of him. She also never claimed to have been held captive by Salgado. According to Officer Soto, when he began pointing out discrepancies in Diaz's statements, Diaz changed her story. He began to ask Diaz more in-depth questions and Diaz responded by answering more slowly, in a "more calculated" manner. Officer Soto could tell that Diaz was a bit more nervous and, based on his experience, she felt burdened. Officer Soto testified that Diaz finally said, "We did it." After that statement, Diaz walked Officer Soto through her version of what happened. He testified that Diaz's demeanor was calm and conversational. He claimed he did not use a harsh voice and used no threats.

[¶24.]     The parties had stipulated to allow the jury to read a physical transcript with Spanish-to-English translation while the video played depicting Officer Soto's interrogation of Diaz in Spanish. The jury observed the interrogation video and listened to the audio recording in conjunction with reading the translated interrogation. The jury also observed a video depicting Diaz's communication with Salgado while Salgado and Diaz were in adjacent interview rooms.

[¶25.]     Salgado testified at trial. Salgado answered the majority of his questions evasively, claiming a lack of knowledge. The State spent the bulk of its examination impeaching Salgado or calling Salgado's attention to his testimony from Diaz's transfer hearing. Salgado mainly responded to questions with, "I don't remember" or "I don't know." However, when given the opportunity, Salgado claimed that he murdered Guevara. He testified that Diaz did not tell him she had a plan to kill Guevara and that Diaz did not want to have anything to do with the

murder. During cross-examination, Salgado refused to answer any more questions. The court declared Salgado unavailable as a witness and counsel for Diaz read to the jury excerpts of Salgado's testimony from the transfer hearing.

[¶26.] Diaz's mother and sister testified that Diaz never had any problems until she met Salgado. They also both claimed that Salgado abused Diaz and tried to have Diaz commit suicide. An expert witness testified about gangs and gang-related activities. He opined that Salgado was a member of a gang and that burning Guevara's car and disposing of evidence indicated a criminally sophisticated mind. One of Diaz's middle school teachers from Indiana testified. The teacher had taught Diaz English as a second language for three years. She described Diaz as "vivacious, outgoing, made friends easily, always willing to help." The teacher testified that Diaz "was a very good student. She caught on quickly. She worked hard. Her grades were good." According to the teacher, Diaz's attendance and grades suffered and Diaz's demeanor changed in eighth grade. She lost friends after becoming pregnant and became, as her teacher described, "quieter and more sullen." Diaz's teacher remained in contact with Diaz's mother and was concerned about Diaz's relationship with Salgado. Diaz ultimately dropped out of school in ninth grade when she ran away with Salgado.

[¶27.] Dr. David Bean had conducted a psychiatric evaluation of Diaz in February 2010. He testified to his protocol and the results he obtained. He diagnosed Diaz with conduct disorder, adolescent-onset type; adjustment disorder with a depressed and anxious mood; physical abuse; and sexual abuse of a child. Dr. Bean described conduct disorder as a showing of "social misbehavior of one sort

or another[.]" He listed different ways an adolescent could show a social misbehavior: lying and truancy to petty criminal acts; doing "mean, nasty things to other people"; or, for school-age children, being "generally disobedient" to both parental figures and those with authority.

[¶28.] Dr. Craig Rypma also testified. He examined Diaz shortly before the trial, approximately five years after Guevara's murder. Dr. Rypma also reviewed Diaz's other evaluations. As a result of his evaluation of Diaz and in consideration of the other materials he reviewed, Dr. Rypma formed several diagnostic impressions. He diagnosed Diaz with adjustment disorder with disturbance of conduct and emotion (but he ruled out depressive disorder), sexual abuse of a child, and physical abuse of a child. Dr. Rypma also testified about the characteristics of a battered woman. He opined that Diaz's situation exhibited characteristics consistent with the characteristics of a battered woman. Dr. Rypma further opined that Diaz's statements to him were consistent with the characteristics of the four stages of the cycle of abuse.

[¶29.] After the defense rested its case, Diaz renewed a motion she had made at the close of the State's case to dismiss the charges against her, asserting the State failed to submit sufficient evidence to support a conviction. The court granted Diaz's motion to dismiss the conspiracy to commit murder charge, but denied her motion regarding the remaining charges. During the settling of the jury instructions, Diaz proposed two instructions related to Diaz's heightened sense of imminent harm as a juvenile battered woman. The court denied Diaz's requested instructions.

[¶30.]       On January 15, 2015, the jury found Diaz guilty of (1) first-degree murder, (2) first-degree felony murder (arson), (3) first-degree arson, (4) felony murder—aggravated kidnapping, and (5) second-degree aggravated kidnapping. Following the verdict, Diaz moved to dismiss the guilty verdicts for first-degree felony murder (arson), first-degree arson, and felony murder—aggravated kidnapping. The court granted Diaz's motion. After a sentencing hearing, the circuit court sentenced Diaz to 80 years in the South Dakota State Penitentiary and a $25,000 fine for first-degree murder and a concurrent 50-year sentence for second-degree aggravated kidnapping.

[¶31.]       Diaz appeals and raises the following issues for our review:

1.    Whether the juvenile court abused its discretion when it transferred Diaz to adult court.

2.    Whether the juvenile court abused its discretion in denying a new hearing on the transfer of Diaz to adult court after the presentation of newly discovered evidence concerning a state witness.

3.    Whether the South Dakota Supreme Court should reconsider its decision in *Diaz I*, 2014 S.D. 27, 847 N.W.2d 144 to reverse the circuit court's order suppressing Diaz's statements to law enforcement.

4.    Whether the circuit court inadequately instructed the jury on the statement of law applicable to the effects of physical and sexual abuse on a juvenile's perception of imminent fear.

5.    Whether the circuit court abused its discretion when it sentenced Diaz to 80 years with no time suspended.

6.    Whether Diaz's 80-year sentence is grossly disproportionate in violation of the Eighth Amendment.

7.    Whether Diaz's 80-year sentence is a de facto life sentence in violation of *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

**Analysis**

## A. Transfer to Adult Court

[¶32.]     We combine the first two issues.  Diaz challenges the juvenile court's decision to transfer her to adult court and denial of her motion to vacate its decision to transfer her to adult court.  She claims that the juvenile court based its decision to transfer her on three interrelated "fallacious" premises.  The first fallacy, according to Diaz, arises from the fact Salgado testified during Diaz's jury trial in direct contradiction to his testimony at the transfer hearing.  Diaz highlights that the juvenile court relied on Salgado's now-discredited testimony at the transfer hearing in concluding that the idea to murder Guevara originated with Diaz and that Diaz carried out the plan.  Diaz secondly claims the juvenile court based its decision in part on the now-unreliable opinions of Dr. Hansen and Dr. Dutton.  Dr. Hansen relied on Salgado's statements, which Salgado retracted at the jury trial.  And Dr. Hansen relied on Dr. Dutton's opinions.  But, according to Diaz, Dr. Dutton's opinion is discredited because Dr. Dutton has "been found to have engaged in sexual harassment himself[.]"

[¶33.]     SDCL 26-11-4 gives the juvenile court discretion to transfer a juvenile to adult court.  The juvenile court may consider:

> (1) The seriousness of the alleged felony offense to the community and whether protection of the community requires waiver;
>
> (2) Whether the alleged felony offense was committed in an aggressive, violent, premeditated, or willful manner;
>
> (3) Whether the alleged felony offense was against persons or property with greater weight being given to offenses against persons;
>
> (4) The prosecutive merit of the complaint.  The state is not required to establish probable cause to show prosecutive merit;

(5) The desirability of trial and disposition of the entire felony offense in one proceeding if the child's associates in the alleged felony offense are adults;

(6) The record and previous history of the juvenile;

(7) The prospect for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile, if the juvenile is found to have committed the alleged felony offense, by the use of procedures, services, and facilities currently available to the juvenile court.

*Id.* If the court concludes that transfer is warranted, the court shall enter "findings of fact upon which the court's decision is based." *Id.* "The findings may not be set aside upon review unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Id.*

[¶34.] At the time of the transfer hearing, Diaz was alleged to have committed the offenses of murder and aggravated kidnapping. The court recognized that the alleged felonies are of the most serious type and, because so, concluded that the community requires protection. The court also considered that the alleged felonies were committed in a premeditated, violent, and willful manner, against a person as opposed to property.

[¶35.] Diaz relies heavily on the fact that Salgado changed his testimony at trial, admitting that he murdered Guevara and Diaz had nothing to do with it. But, even if we disregard Salgado's transfer hearing testimony, Diaz's statements to law enforcement support the juvenile court's conclusion that Diaz exhibited a willing and premeditated participation in Guevara's murder and kidnapping. Also, the record supports the court's findings that Diaz's actions were not a product of control by Salgado or a product of her fear of him. The court found that Diaz did not exhibit fear of Salgado during her interrogation and inconsistently claimed that

Salgado forced her during her subsequent psychological examinations. The court's finding of prosecutive merit is also supportable. Diaz's statements to law enforcement, the Walmart video, and Diaz's sweatshirt with Guevara's blood support Diaz's participation in Guevara's murder.

[¶36.] Diaz further claims that the court erred when it transferred her to adult court given the evidence of her prospects for rehabilitation by the use of procedures, services, and facilities available to the juvenile court. She emphasizes that she was only 15 years old at the time of the crime and under the control of Salgado.[1] Salgado had sexually abused her, and she became pregnant with Salgado's baby at 13 years old. Salgado encouraged Diaz to kill herself and even helped her cut her wrists. She claims that the evidence indisputably showed that before her relationship with Salgado, she had obtained good grades in school and was a "happy, joyful little girl." Diaz contends that she was completely dependent upon Salgado in Mitchell with no identification, no job, and no way to return home. She further emphasizes that she had no prior experience with the criminal system.

[¶37.] The circuit court specifically considered Diaz's claims—her youth, her relationship with Salgado, her life before her relationship with Salgado, and her emigrant status. Diaz postures her argument as though this Court should disregard Salgado's entire testimony at the transfer hearing and Dr. Dutton's

---

1. At the time of her appeal, Diaz was over 21 years old. Had Diaz remained in juvenile court and been adjudicated, the Department of Corrections would no longer have jurisdiction over Diaz. *See* SDCL 26-11A-5. Under SDCL 26-11A-20, "[n]o adjudicated juvenile may remain within the jurisdiction of the Department of Corrections beyond the age of twenty-one years."

testimony. But Salgado's refusal to testify at Diaz's trial does not, as a matter of law, nullify his transfer hearing testimony. And the circuit court examined Diaz's evidence that Dr. Dutton sexually assaulted a student, concluding that it nonetheless found Dr. Dutton's testimony at the transfer hearing credible. Our review of the court's findings and conclusions support that it would be contrary to the best interests of Diaz and the public that the juvenile court retain jurisdiction.

### B. This Court's Reconsideration of *Diaz I*

[¶38.] Diaz asks this Court to reconsider its ruling in *Diaz I* in light of the United States Supreme Court's continuing concern over the rights of juveniles in criminal court expressed most recently in *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016). Diaz claims reconsideration is warranted because Salgado testified during the jury trial that Guevara's murder was his idea and that Diaz did not help. Diaz also claims that this Court did not know when it decided *Diaz I* that law enforcement placed a bottle of lighter fluid on the table in front of Diaz when interrogating her. To Diaz, that tactic was "an abominable practice with a 15-year-old defendant, clearly designed to intimidate her."

[¶39.] The State claims Diaz failed to preserve this issue for our review because she did not specifically move the *circuit court* to reconsider its suppression ruling. But Diaz seeks not to have the circuit court reconsider its decision—rather, she asks *this* Court to reconsider its ruling in *Diaz I*. Also, Diaz repeatedly challenged the admission of her statements before the circuit court. Before trial, she sought a motion in limine to prevent the admission of the evidence, which the

court denied. She also requested a standing objection during the trial, which the court granted. We address Diaz's issue.

[¶40.] A review of the United States Supreme Court's opinions in *Montgomery*, ___ U.S. ___, 136 S. Ct. 718 and *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) does not warrant this Court reconsidering its ruling in *Diaz I*, 2014 S.D. 27, 847 N.W.2d 144. The United States Supreme Court opinions adopt the view that juveniles are different than adults and, because so, certain sentences for juveniles are unconstitutional. Though *Diaz I* did not involve a review of Diaz's sentence, our decision adhered to the principle that Diaz, a juvenile, deserves "additional, not less, protection of [her] constitutional rights." 2014 S.D. 27, ¶ 22, 847 N.W.2d at 154 (alteration in original) (quoting *In re J.M.J.*, 2007 S.D. 1, ¶ 15, 726 N.W.2d 621, 628). We identified that "'children can be easy victims of the law' and 'may lack the sophistication, knowledge, or maturity to understand the ramifications of an admission[.]'" *Id.* So we examined Diaz's confession with "special care[.]" *Id.* A review of the record also reveals that this Court had before it, when deciding *Diaz I*, that law enforcement placed a bottle of lighter fluid in front of Diaz during the interrogation.

## C. Jury Instructions on Imminent Fear

[¶41.] Diaz avers that the circuit court failed to adequately instruct the jury on her theory of the defense because the court's standard instruction on duress did not explain the heightened sense of imminent danger felt by an abused minor. In Diaz's view, the court's use of the general reasonable person standard failed to direct the jury to consider necessary juvenile considerations. She also claims that

her requested instructions were correct statements of the law and were warranted by the evidence. She argues that the court's refusal prejudiced her because "[w]ithout a specific instruction bringing attention to the fact that a child perceives danger in a different light than an adult," she was unable to "argue that the law supports a different standard for a child than for an adult." According to Diaz, "[h]ad the jury been instructed as requested the jury would likely have given more consideration to the defense of duress and would have probably returned a not-guilty verdict."

[¶42.]     As we recently stated in *State v. Birdshead*, "[w]e review a circuit 'court's decision to grant or deny a particular instruction' and 'the wording and arrangement of its jury instructions' for an abuse of discretion." 2015 S.D. 77, ¶ 14, 871 N.W.2d 62, 70 (quoting *State v. Roach*, 2012 S.D. 91, ¶ 13, 825 N.W.2d 258, 263). However, "'a court has no discretion to give incorrect or misleading instructions, and to do so prejudicially constitutes reversible error.'" *State v. Jones,* 2011 S.D. 60, ¶ 5 n.1, 804 N.W.2d 409, 411 n.1 (quoting *Kadrmas, Lee & Jackson, Inc. v. Morris*, 2010 S.D. 61, ¶ 5 n.1, 786 N.W.2d 381, 382 n.1). Whether the court gave incorrect or misleading instructions to a defendant's prejudice is a question of law reviewed de novo. *Birdshead*, 2015 S.D. 77, ¶ 14, 871 N.W.2d at 70. We, therefore, consider jury instructions "as a whole, and if the instructions when so read correctly state the law and inform the jury, they are sufficient." *State v. Waloke*, 2013 S.D. 55, ¶ 28, 835 N.W.2d 105, 113 (quoting *State v. Klaudt*, 2009 S.D. 71, ¶ 13, 772 N.W.2d 117, 121).

[¶43.]     The circuit court instructed the jury that:

A person may not be convicted of a crime based upon conduct engaged in because of the use or threatened use of unlawful force upon the defendant which force or threatened use thereof a reasonable person in his situation would have been unable to resist.

This use or threatened use of force must be present and immediate and of such a nature as to induce in the defendant's mind the well-grounded apprehension of imminent death or serious bodily injury if the act is not done. Threat or fear of future injury is not sufficient. There must be no reasonable opportunity for the defendant to escape the danger without committing the crime. If you have a reasonable doubt whether the defendant committed the act with which the defendant is charged under the use or threatened use of force as it has been defined, you must return a verdict of not guilty.

Instruction 44. In regard to the Battered Woman's Syndrome, the court instructed

the jury as follows:

Evidence has been presented concerning the characteristics of a condition known as Battered Woman Syndrome. It is for you to determine if the defendant was suffering from Battered Woman Syndrome at the time of the alleged offense. If you find that the defendant was suffering from Battered Woman Syndrome, you may then use that evidence in evaluating any claim that the defendant feared imminent death or serious bodily injury if she did not carry out the criminal acts for which she is charged.

Instruction 45. Diaz did not object to the court's instructions. She requested that

the court additionally instruct the jury as follows:

Instruction No. 99: You may consider whether or not the defendant was battered or abused by Alexander Salgado. If you decide that the defendant was battered or abused by Alexander Salgado, you may consider that in determining the reasonableness of the defendant's perception of the immediacy of the harm in light of the defendant's experience of abuse.

Instruction No. 100: The imminent danger element may be satisfied when a child believes she is in imminent danger of death or serious bodily harm even though her abuser is not physically abusing her at the time. This is because an abused child can experience a heightened sense of imminent danger arising from perpetual physical and mental abuse.

-21-

[¶44.] From our review of the court's instructions, the court adequately instructed the jury on Diaz's theory of the defense. The court's instructions informed the jury that it could consider whether Diaz (a juvenile) was a battered woman and that Diaz could not be convicted of a crime if her conduct was the product of a threatened use of unlawful force of which a reasonable person in Diaz's situation would not have been able to resist. These instructions connect Diaz's defense to her juvenile status—a reasonable person in Diaz's situation is a 15-year-old runaway, an emigrant, and a child sexually and physically abused. Also, Diaz directs this Court to no authority that the law on duress or imminent fear is different when the case involves a juvenile.

### D. Diaz's 80-Year Sentence

[¶45.] We combine Diaz's last three issues. Diaz challenges the court's 80-year sentence for several reasons. She claims the court's sentence is an abuse of discretion because the court did not adequately consider that Diaz exhibited the potential for rehabilitation. She further claims that the court's sentence is grossly disproportionate to the conduct for which she was convicted. Lastly, Diaz argues that the court's sentence is a de facto life sentence in violation of the spirit of *Montgomery*, ___ U.S. ___, 136 S. Ct. 718, *Miller*, ___ U.S. ___, 132 S. Ct. 2455, *Graham*, 560 U.S. 48, 130 S. Ct. 2011, and *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

### 1. Abuse of Discretion

[¶46.] Diaz claims the court abused its discretion when it sentenced her to 80 years without any time suspended because, in her view, the sentence disregarded

any potential for her rehabilitation. Amicus, Center on Wrongful Convictions of Youth (CWCY), argues that the circuit court considered only the violent nature of Diaz's crime, not her age, developmental immaturity, and vulnerability. CWCY also contends that the court disregarded peer pressure as a factor and instead faulted Diaz for seeking out her relationship with Salgado and her choice to continue that abusive relationship. According to CWCY, the circuit court "misses the point"—Diaz's coercive and abusive relationship directly mitigates Diaz's culpability and Diaz was less culpable than an adult making a similar decision. Amicus, The Consulate of Mexico (Consulate), claims that "the court failed to acknowledge the poverty and dislocation experienced by [Diaz] as a child brought by a single parent to the United States from Mexico at the age of eleven." It highlights that Diaz was brought to the United States less than four years before the commission of the crime. In the Consulate's view, the circuit court minimized and dismissed the factor of "family environment" when considering Diaz's culpability.

[¶47.]     Before sentencing a defendant, the court is to "acquire a thorough acquaintance with the character and history of the [person] before it." *State v. Lemley*, 1996 S.D. 91, ¶ 12, 552 N.W.2d 409, 412 (quoting *State v. Chase in Winter*, 534 N.W.2d 350, 354-55 (S.D. 1995)). "In fashioning an appropriate sentence, courts must also look to the character and history of the defendant. This requires an examination of the defendant's 'general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record' as well as rehabilitation prospects." *State v. Bruce*, 2011 S.D. 14, ¶ 29, 796 N.W.2d 397, 406 (quoting *State v. Bonner*, 1998

S.D. 30, ¶ 19, 577 N.W.2d 575, 580). A sentence within the statutory maximum is generally reviewed for an abuse of discretion, and we give great deference to the court's sentencing decision. *State v. McKinney*, 2005 S.D. 73, ¶ 10, 699 N.W.2d 471, 476.

[¶48.] The court identified that "[i]n this particular case," the court must be guided by the considerations set out in *Miller* because Diaz is a juvenile. In particular, the court noted its duty to consider mitigating factors. In doing so, the court noted that "children tend to have a lack of maturity and an underdeveloped sense of responsibility that can often lead to recklessness and impulsivity." The court also observed that children "are more vulnerable to negative influences and outside pressures, including from family and peers." The court observed "that a child's character is not as hardened, the mold is not as firm as that of most adults, their traits not as fixed and therefore more malleable, more capable of change on average than an adult." The court further identified four factors it would consider: (1) Diaz's chronological age and characteristics, including any immaturity and failure to appreciate risks and consequences; (2) Diaz's family and home environment; (3) the circumstances of the homicide, including the extent of Diaz's participation and the manner in which peer pressures may have affected her; and (4) the reasonable possibility of rehabilitation.

[¶49.] The court then identified Diaz's youth, her emigrant status, and her life in poverty. The court considered that Diaz "was a responsible, caring, loving person" up until a certain age and to some extent in the five years preceding sentencing. The court noted that it believed that Diaz does "have genuine sorrow[.]"

The court was "confident" that Salgado's abuse of Diaz was "true." But the court explained that "despite having the repeated efforts of your mother, your older sisters, school officials, Child Protection Services, [you] stayed with him, even after your wrists were slit and he left you to die, even after a protection order was entered against him to keep him away from you. And even when he planned to leave the State of Indiana alone, you insisted on abandoning your own daughter to go with him."

[¶50.] The court considered Diaz's role in Guevara's murder. To the court, Diaz repaid Guevara's "kindness with the worst kind of evil" and "for no reason." The court highlighted that the crime was deliberate, gruesome, wanton, and chilling, after which Diaz showed no remorse. The court found that Diaz exhibited prospects for rehabilitation but concluded that much of that would "need to take place behind the walls of an institution." The circumstances, in the court's view, warranted imposing a "serious punishment." From our review, the court became acquainted with Diaz through the trial and sentencing hearing and gave due consideration to the sentencing factors. The court did not abuse its discretion when it sentenced Diaz.

## 2. Gross Disproportionality

[¶51.] We conduct a de novo review to determine whether Diaz's sentence is grossly disproportionate to the gravity of the offense. *State v. Chipps*, 2016 S.D. 8, ¶ 31, 874 N.W.2d 475, 486. Under the Eighth Amendment to the United States Constitution, "a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *Solem v. Helm*, 463 U.S. 277, 290, 103 S. Ct. 3001,

3009, 77 L. Ed. 2d 637 (1983). Yet, "[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S. Ct. 2680, 2705, 115 L. Ed. 2d (1991) (Kennedy, J., concurring in part and concurring in the judgment). If an appearance of gross disproportionality results after the initial comparison of the gravity of the offense against the harshness of the penalty, only then will we compare Diaz's sentence to those imposed on other criminals for the same crime within or, if necessary, outside the jurisdiction. *Chipps*, 2016 S.D. 8, ¶¶ 34, 38, 874 N.W.2d at 487, 489.

### a. Gravity

[¶52.]        "[T]he gravity of the offense refers to the offense's relative position on the spectrum of all criminality." *Id.* ¶ 35. "Comparisons can be made in light of the harm caused or threatened to the victim or society, and the culpability of the offender." *Helm*, 463 U.S. at 292, 103 S. Ct. at 3011. As we noted in *Chipps*, additional principles aid in judging the gravity of the offense. 2016 S.D. 8, ¶ 35, 874 N.W.2d at 487-88.

> [N]onviolent crimes are less serious than crimes marked by violence or the threat of violence. . . . Stealing a million dollars is viewed as more serious than stealing a hundred dollars. . . . [A] lesser included offense should not be punished more severely than the greater offense. . . . It also is generally recognized that attempts are less serious than completed crimes. Similarly, an accessory after the fact should not be subject to a higher penalty than the principal. . . . Most would agree that negligent conduct is less serious than intentional conduct. . . . A court, of course, is entitled to look at a defendant's motive in committing a crime. Thus a murder may be viewed as more serious when committed pursuant to a contract. This list is by no means exhaustive.

*Id.* (quoting *Helm*, 463 U.S. at 292-94, 103 S. Ct. at 3011 (internal citations omitted)). "In conducting the threshold comparison between the crime and the sentence, we also consider other conduct relevant to the crime" of conviction. *State v. Garreau*, 2015 S.D. 36, ¶ 12, 864 N.W.2d 771, 776.

[¶53.]     The jury convicted Diaz of first-degree murder. In *State v. Rice*, we recognized that "homicide has long been considered 'the highest crime against the law of nature, that man is capable of committing.'" 2016 S.D. 18, ¶ 14, 877 N.W.2d 75, 80 (quoting 4 Williams Blackstone, *Commentaries* 177-78). "It is axiomatic that the unlawful, premeditated killing of one person by another . . . is one of the most egregious acts contemplated by our criminal justice system." *Garreau*, 2015 S.D. 36, ¶ 11, 864 N.W.2d at 775. Guevara's death resulted from a premeditated killing, and Diaz took no step to protect Guevara's life. Each act Diaz took during her role in the murder of Guevara exhibited an indifference to Guevara's life. Diaz lured Guevara to her death under the false pretense of an invitation to join her new friends for a cookout. Diaz then gave no warning to Guevara, despite having opportunity to do so at Walmart and when Diaz and Guevara were alone in the vehicle. Diaz's conviction of first-degree murder places Diaz's crime at the uppermost level on the spectrum of criminality.

### b. Harshness

[¶54.]    The harshness component looks, not to the maximum penalty available, but "to the penalty's relative position on the spectrum of permitted punishments." *Chipps*, 2016 S.D. 8, ¶ 37, 874 N.W.2d at 488. Diaz only challenges her sentence for first-degree murder. First-degree murder is a Class A felony and carries a maximum sentence of death or mandatory life and a maximum fine of $50,000. SDCL 22-16-12; SDCL 22-6-1. However, neither a sentence of death nor a sentence of mandatory life is a permitted punishment against a juvenile. *Roper*, 534 U.S. 551, 125 S. Ct. 1183; *Miller*, ___ U.S. ___, 132 S. Ct. 2455. This means that the spectrum of permitted punishments does not include or end at death as it would in our review of an adult sentence under the Eighth Amendment.[2] Under SDCL 22-6-1, the harshest penalty a court can impose against a juvenile convicted of this State's most severe crime is "a term of years in the state penitentiary, and a fine of fifty thousand dollars[.]"[3]

---

2.    In *Miller*, the United States Supreme Court recognized that "*Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing." ___ U.S. ___, 132 S. Ct. at 2464. Therefore, the "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Id.* at ___, 132 S. Ct. at 2466. Following the decision in *Miller*, we recognized that "[s]entencing courts must consider what the United States Supreme Court termed the 'mitigating qualities of youth.'" *State v. Springer*, 2014 S.D. 80, ¶ 14, 856 N.W.2d 460, 465 (quoting *Miller*, ___ U.S. ___, 132 S. Ct. at 2467).

3.    In *Springer*, we examined whether a sentence of 216 years constitutes a de facto life sentence in violation of the Eighth Amendment. 2014 S.D. 80, ¶ 15, 856 N.W.2d at 466. We recognized that neither *Graham* nor *Miller* explicitly applied to sentences for a term of years. Springer argued, however, that his

(continued . . .)

*See Helm*, 463 U.S. at 298, 103 S. Ct. at 3013 ("consider the sentences that could be imposed on other criminals in the same jurisdiction").

[¶55.]        In *Chipps*, we recognized that "[f]or sentences of imprisonment, the question is one of degree—e.g., '[i]t is clear that a 25-year sentence generally is more severe than a 15-year sentence[.]'" 2016 S.D. 8, ¶ 37, 874 N.W.2d at 488 (alterations in original) (quoting *Helm*, 463 U.S. at 294, 103 S. Ct. at 3012). The comparison is really "one of line-drawing." *Helm*, 463 U.S. at 294, 103 S. Ct. at 3012. However, in judging the harshness of the penalty, we also consider the possibility of parole. *Chipps*, 2016 S.D. 8, ¶ 37, 874 N.W.2d at 488.

[¶56.]        Here, the court sentenced Diaz to 80 years with no time suspended for her conviction of first-degree murder. We also consider that Diaz would be eligible for parole at 55 years old, after 40 years served. *Chipps*, 2016 S.D. 8, ¶ 37, 874 N.W.2d at 489. Based on the gravity of the crime of first-degree murder, Diaz's sentence for a term of years allowing her the possibility of early release does not appear grossly disproportionate. Therefore, we will not compare Diaz's sentence to

_____

(. . . continued)

     sentence violated *Graham* and *Miller* because the sentence is the functional equivalent of life without parole. *Id.* ¶ 17. We disagreed in part because Springer had the possibility of parole when he would be 49 years old. The Court noted that without evidence that 49 years old falls outside of Springer's practical life expectancy, his sentence could not be the functional equivalent of life without parole. *Id.* ¶ 22. We further concluded that Springer had a meaningful opportunity to obtain release as required by *Graham*. *Id.* ¶ 25.

     Similarly, here, the circuit court specifically considered the mitigating qualities of youth and Diaz's opportunity to obtain release. Diaz would be eligible for parole possibly after 40 years served. Diaz presented evidence that her life expectancy at the time of trial was 83.7 years. If she obtained release on parole after serving 40 years, Diaz would be 55 years old.

those imposed on other criminals for the same crime within or outside the jurisdiction.

### 3. De Facto Life Sentence

[¶57.]      Diaz relies on her expert testimony that she could live for an estimated 68.7 additional years. At the time of her sentence, five years had elapsed and Diaz was 20 years old. According to Diaz's evidence, a sentence of 80 years is beyond her life expectancy and constitutes a de facto life sentence in violation of *Montgomery*, ___ U.S. ___, 136 S. Ct. 718, *Miller*, ___ U.S. ___, 132 S. Ct. 2455, *Graham*, 560 U.S. 48, 130 S. Ct. 2011, and *Roper*, 543 U.S. 551, 125 S. Ct. 1183. CWCY joins Diaz's argument, asserting that Diaz's sentence is the equivalent of life without parole because the sentence fails to provide a meaningful opportunity for release. CWCY insists that "[p]roviding parole eligibility after four decades in prison denies [Diaz] an opportunity to live a meaningful life in the community and contribute to society."

[¶58.]      Diaz was 20 years old when she was sentenced to 80 years in prison, but had already been incarcerated for five years. Based on SDCL 24-15A-32, she could be released on parole after serving 40 years in prison. Diaz asks this Court not to "consider possible parole as a factor in deciding whether the court has imposed a life sentence." But Diaz's meaningful opportunity for release requires this Court to consider Diaz's opportunity for parole. *See Springer*, 2014 S.D. 80, ¶ 24, 856 N.W.2d at 469. Diaz's sentence is not a de facto life sentence. Diaz directs us to no law supporting that release at 55 years old or after 40 years in prison means Diaz is without a meaningful opportunity to obtain release. *See id.* ¶ 25.

#27432

[¶59.]     Affirmed.

[¶60.]     GILBERTSON, Chief Justice, and ZINTER and SEVERSON, Justices, and SOMMERS, Circuit Court Judge, concur.

[¶61.]     SOMMERS, Circuit Court Judge, sitting for KERN, Justice, disqualified.